OPINION
{¶ 1} Appellant, Jermaine McKinney, appeals his conviction of two counts of aggravated murder and related offenses following a jury trial in the Trumbull County Court of Common Pleas. He argues the trial court committed prejudicial error during his trial. Upon a thorough review of the record and consideration of the assignments of error, this court affirms appellant's conviction. *Page 2 
 {¶ 2} In December, 2005, Melissa Barry, a resident of Austintown, Ohio, was in the process of obtaining custody of her minor brother and sister because their mother Rebecca Cliburn was unable to care for them due to her addiction to drugs.
 {¶ 3} Melissa had a close relationship with her widowed grandmother Wanda Rollyson, who lived alone in a small two-bedroom house on Newton Bailey Road in Newton Township, Ohio. The property consisted of 26 acres and included a garage behind the house. Melissa talked to Wanda on the phone several times everyday. Wanda attended church every Sunday morning and Wednesday evening, and would always call Melissa when she came home. On Wednesday, December 21, 2005, Wanda attended the evening service, but did not call Melissa that evening. Melissa called her several times that evening but there was no response.
 {¶ 4} On Thursday, December 22, 2005, Melissa went to work and called Wanda during the day and left messages, but Wanda did not return the calls. After work, Melissa drove to Wanda's house to check on her. She arrived at the house at approximately 5:30 p.m. She noticed the garage door was open and Wanda's car was in it, but when she knocked on the front door, there was no response. She also saw footprints in the snow that did not belong to her grandmother. Fearing that something was wrong, Melissa called 911.
 {¶ 5} Chief Frank Tomaino of the Newton Township Police Department arrived at 5:45 p.m. It was starting to get dark and there was snow on the ground. He opened the storm door at the back of the house and found the interior door was ajar. They both entered the house and smelled something burning. The house was dark other than the Christmas lights that were on upstairs. Using his flashlight, Chief Tomaino went in the *Page 3 
basement and saw a large pool of blood inside the door. Melissa left the house. Upon entering another room in the basement, the chief saw the remains of a human foot in a pile of ashes and drag marks going through the blood in the direction of that room.
 {¶ 6} Chief Tomaino went out of the house and called for a squad car, the fire department, and the Bureau of Criminal Identification and Investigation ("BCI"). While securing the scene, he noticed there were bloody footprints that led from the back door toward the driveway. Chief Tomaino asked the Trumbull County Sheriffs Office to take over the investigation of the case. From jewelry found on the victims, Melissa identified them as her mother and grandmother.
 {¶ 7} When Kenneth Evans, squad commander of the Newton Falls Fire Department, arrived on scene, Chief Tomaino led him into a furnace room in the basement where he found parts of two burnt bodies. He saw a partial leg and hand and the outline of a body. He also found part of an arm and hand. Both bodies were near a 275-gallon oil tank. He was amazed that, as hot as the fire must have been, the oil tank did not catch fire or explode.
 {¶ 8} Mitchel Meadows, the pastor of Wanda's church, saw her at the church service on Wednesday evening, December 21, 2005. He said Wanda left the church at 8:30 p.m. and it would have taken her ten minutes to drive home.
 {¶ 9} Detective Peter Pizzulo of the Trumbull County Sheriffs Office was assigned as the lead investigator. He went to Wanda's residence on December 23, 2005. As he walked down the steps into the basement, he saw a pool of dried blood near the bottom of the steps. Wanda's eyeglass frames and two lenses were near the pool of blood. To the left of the bloody pool was a clothes rack with hangers that had *Page 4 
been disturbed. Items on the rack had blood splatter on them. There were drag marks leading from that bloody pool to a furnace room. From the drag marks, he determined that Wanda had been dragged 21 feet from the pool of blood to the furnace room. He saw shoe impressions in the blood and bloody footprints around the pooling of blood. There was a blood-patterned boot impression near one of Wanda's lenses.
 {¶ 10} There was another pool of blood in the adjoining TV room. There were also drag marks from that pool of blood to the furnace room, from which the detective concluded that Rebecca had been dragged 23 feet to the furnace room.
 {¶ 11} Wanda left a pattern of her clothing in her trail of blood; however, in the bloody trail left behind from Rebecca being dragged, there was no evidence of clothing. He concluded that Rebecca was nude when she was being dragged. Detective Pizzulo determined that Rebecca had been dragged first to the furnace room and Wanda was dragged later because Wanda's drag marks went over Rebecca's.
 {¶ 12} In the furnace room under the oil tank were the remains of the two victims covered by burnt debris. Their limbs had been thermally amputated due to the intense heat of the fire. There were empty cans of deck stain in the debris, and a brownish material had been splashed on the victims that was the same color as the contents of the cans.
 {¶ 13} Wanda's right arm was recovered. Her sweater was pulled down on her hand, consistent with her being dragged. Both of Rebecca's feet had been thermally amputated. *Page 5 
 {¶ 14} A bed sheet was wrapped around Rebecca's mouth like a gag and tied around her neck. It was in place when she was burnt and protected her skin from the fire.
 {¶ 15} Detective Pizzulo collected four cigarette butts, including one butt near the furnace room, which he sent to BCI for DNA analysis.
 {¶ 16} The foot impressions near both pools of blood were made by the same boot. There was only one bloody shoe pattern throughout the basement.
 {¶ 17} In Wanda's bedroom there was a window looking out to the garage. A jewelry box was opened and its contents dumped on the bed. In the second bedroom, the contents of Wanda's purse had been dumped on the bed. Wanda's wallet was open. Her driver's license and credit cards were missing, and there was no cash in the wallet.
 {¶ 18} Trumbull County Forensic Pathologist Humphrey Germaniuk testified he arrived at the scene on December 23, 2003 at 8:30 a.m. Upon entering the furnace room, he saw Wanda's body lying face down and close to the furnace. Rebecca's body was face up by the oil tank. The only remains of Wanda were parts of her right and left leg and her left arm. Rebecca's left arm was outstretched. Most of Rebecca's abdominal and chest organs were carbonized and charred. There was nothing left of the vaginal area. There was a brown resin material in her hair. There were two streams of blood from Rebecca's forehead.
 {¶ 19} The bodies were taken to Trumbull Memorial Hospital where autopsies were performed. Dr. Germaniuk determined that Rebecca had sustained multiple blunt force trauma to her head that caused at least two skull fractures to the left front and *Page 6 
right side at the base of the skull and related brain injury. These were serious injuries that would result in death without medical attention. There were two injuries to Rebecca's upper left forehead. There was also injury to the right side of her forehead. These injuries would have caused considerable pain. Rebecca's injuries were consistent with being beaten by the crowbar later recovered by police. Further, because the ligature around Rebecca's neck was tightly wrapped and covered her mouth, it inhibited her ability to breath. Rebecca's cause of death was blunt force trauma associated with asphyxia.
 {¶ 20} As a result of thermal amputation, Wanda was in four pieces. Because there was thermal destruction of 80 per cent of her body, Dr. Germaniuk could only conclude that Wanda's cause of death was homicide at the hands of another. This cause of death is consistent with a gunshot wound to the head or being hit with a crowbar.
 {¶ 21} According to Melissa, Wanda gave Rebecca $200 every day, which she used to support her drug habit. At times she would meet Wanda at church, then go to the ATM, where Wanda would give her money. Rebecca had friends in the drug world who she would bring to Wanda's house when she came to get money.
 {¶ 22} Detective Pizzulo testified that on December 27, 2005, he got a tip that an employee at Denny's Restaurant in Liberty, Ohio, Amy Corll, may have information about these crimes. He also received information from local police that Western Union had provided the name Amy Corll as a person to whom a person claiming to be Wanda Rollyson wanted to transfer funds with a debit card on December 21, 2005 at 11:30 p.m. Based on this information, Detective Pizzulo contacted Amy on December 28, 2005. *Page 7 
She gave a detailed statement regarding her involvement and implicated appellant, Jazzmine McIver, and Keyatta Riley.
 {¶ 23} Also, on December 28, 2005, Detective Pizzulo received a tip from an informant that Keyatta Riley, who was driving a white car owned by appellant, may have been involved. On December 29, 2005, a surveillance team located that vehicle parked next to a residence in Youngstown where it was determined Keyatta was staying. The detective contacted her and she agreed to cooperate and to provide a statement to the Sheriffs Office. She implicated appellant and Jazzmine. Based on these statements, on December 30, 2005, Detective Pizzulo obtained arrest warrants for appellant, Keyatta, and Jazzmine.
 {¶ 24} An indictment charged appellant with the aggravated murder with prior calculation and design of Rebecca and Wanda, respectively, in violation of R.C. 2903.01(A) and (F) with specifications of aggravating circumstances of multiple murders, in violation of R.C. 2929.04(A)(5), aggravated burglary, in violation of R.C. 2929.04(A)(7), aggravated robbery, in violation of R.C. 2929.04(A)(7), kidnapping, in violation of R.C. 2929.04(A)(7), and aggravated arson, in violation of R.C. 2929.04(A)(7) (Counts One and Three); the aggravated murder in the commission of a felony of Rebecca and Wanda, respectively, in violation of R.C. 2903.01(B) and (F), with the same specifications (Counts Two and Four); aggravated burglary, a felony of the first degree, in violation of R.C. 2911.11(A)(1)(2) and (B) (Count Five); aggravated robbery, a felony of the first degree, in violation of R.C. 2911.01(A)(1)(3) and (C) (Count Six); the kidnapping of Rebecca, a felony of the first degree, in violation of R.C. 2905.01(A)(2)(3) and (C) (Count Seven); the kidnapping of Wanda, a felony of the first degree, in *Page 8 
violation of R.C. 2905.01(A)(2)(3) and (C) (Count Eight); and aggravated arson, a felony of the second degree, in violation of R.C. 2909.02(A)(2) and (B)(3) (Count Nine).
 {¶ 25} At the jury trial the state's witnesses included Melissa Barry; Chief Tomaine; Dr. Germaniuk; Detective Pizzulo; appellant's accomplices, Jazzmine, Keyatta, and Amy; Jennifer Brindisi, news reporter for Youngstown Channel 27; Detective Zaida Miranda and Officer Dave Wilson of the Youngstown Police Department, regarding appellant's arrest on January 1, 2006; and Christopher Smith and Brenda Gerardi of BCI.
 {¶ 26} Jazzmine McIver ("Jazz") testified that she and Rebecca were good friends. They lived in separate apartments at the Warren Village Apartments in Warren, Ohio. Jazz met appellant in 2002, and was introduced to him by his nickname, "Maniac." Beginning in 2005, appellant would often visit her, at which times he would stay the night. She said they were "real close."
 {¶ 27} On December 21, 2005, Jazz came home to her apartment and found appellant inside with a friend of his, who appellant introduced to Jazz as Keyatta or "BK." Appellant told Jazz that Rebecca had money she was supposed to give him and Rebecca wanted to go to her mother's house to take her bank card. Appellant said that BK would drop him and Rebecca off at the mother's house, then BK would come back to Jazz's apartment. He wanted Jazz to drive back out to the mother's house with BK to pick him up in Jazz's car because, he said, his car was too loud.
 {¶ 28} Appellant, Rebecca, and BK left, and, about 45 minutes later, BK came back to Jazz's apartment. After awhile, appellant called BK on her cell phone and they talked briefly. He then called her again, and BK said it was time to go and they left. BK *Page 9 
directed Jazz to Wanda's house. Upon arrival, BK told her to back her car into the garage, but there was another car in the garage so Jazz pulled up to the side of the house.
 {¶ 29} BK got out of Jazz's car and left her cell phone on the passenger seat. She was in the house for awhile when BK's cell phone rang. Jazz answered it because the caller ID on the phone indicated it was from "Maniac," i.e., appellant. BK was on appellant's phone and said, "The club was going to burn down." Jazz did not understand what BK was saying and said she had to go home. BK said she would call back in a minute and hung up.
 {¶ 30} After sitting in the car for almost an hour, BK called Jazz again and told her to go in the garage and look for a button to pull the door down. Jazz refused because she was afraid, and she heard appellant in the background saying, "tell her * * * ain't no time to be playing * * *."
 {¶ 31} Soon thereafter, appellant and BK came out of the house and opened the back doors of the car. They put a blanket over Jazz's back seat. BK got in the rear passenger seat. Appellant picked up a basket with clothes in it; went in the back seat with the basket; and said, "Just drive."
 {¶ 32} When appellant got in the car, Jazz saw he had blood on his jeans and on his boots. She saw that there were clothes in the basket and a blanket that had a crowbar in it. While driving back to Warren, Jazz asked him if he got the money. Appellant said, "No;" "This is my first time;" and "I took somebody's grandmother, somebody's mother away from them." *Page 10 
 {¶ 33} When Jazz approached the corner of Tod and Palmyra in Warren, she said she would take them to their car, and appellant said, "No, you about to take us to Youngstown." Jazz went to get her purse in the back seat and saw a gun in appellant's hand. She said that it was a small silver gun that appellant carried with him, and that she had seen him with it about 15 times before. The gun she identified in court as belonging to appellant was taken by police from appellant's house when he was arrested there on January 1, 2006.
 {¶ 34} Appellant directed Jazz through back roads. He called his cousin in Youngstown and said he needed pants and socks. When they arrived there, appellant got out of the car, got the clothes, and returned to the car. He stripped down to his boxers; put his bloody clothes in the basket; then put on the clothes.
 {¶ 35} As they were driving on a bridge over McKelvey Lake, appellant told Jazz to stop. He asked Jazz for her coat and he put it on. He got out of the car with just his socks on. He took the blanket with the crowbar and his boots and threw them over the bridge. She said he got mad because the items did not break the ice.
 {¶ 36} At an abandoned house on Josephine Avenue in Youngstown, appellant told Jazz to let him out. He told her to drive around the corner and then to pick him up. He walked to the back of a house with the basket of clothes. Jazz drove around the block and when she came back the house was on fire. Appellant got in the car and they left.
 {¶ 37} As Jazz was driving, appellant said he had this girl Amy, who was in love with him and would do anything he asked. He said he would call her at work and get *Page 11 
her to leave to do a wire transfer. Appellant made the call, and, while going to pick her up, he said, "if she gets this * * * wire transfer for me, I'm going to have to * * * kill her."
 {¶ 38} Appellant directed Jazz to Amy's house. When they arrived there, he called her on his cell phone and she came out to the car. He told her if she helped him get this wire transfer, he would marry her and she agreed.
 {¶ 39} BK pulled out Wanda's bank card and driver's license and made a call. BK took Amy's documents to make the wire transfer. After a while, BK was put on hold and when the agent came back, BK told her she could not have talked to the real cardholder. Appellant told her to hang up and told Jazz to drive.
 {¶ 40} Appellant told Jazz he wanted to go to his father's house and gave her directions to get there. Appellant and Jazz went in, while Amy and BK stayed in the car. His father saw appellant had blood on his hands and was nervous. Appellant told his father he needed to use his car, but his father did not comply.
 {¶ 41} Later, appellant told Jazz to bring Amy and BK in the house and she told them to come in. While appellant was washing blood off his hands, he told Jazz, "she didn't give me the money," "so I killed her." He said he had sex with Rebecca and that gave him a way to tie her up. He tied her with head phone wires. He beat her and smothered her. He said he hit her in the head with a crowbar. He said she was "gurgling," but she was still breathing. He said he waited for her mother to come in and he pushed her down the stairs and she hit her head. He said he poured paint on Rebecca because he had sex with her and he did not want his DNA on her because he did not use a condom. He said he poured it on her and he set her on fire "on her private areas." *Page 12 
 {¶ 42} Appellant told his father to take Amy home. Then the others got in Jazz's car. They went back to the area where he set the house on fire. He burned Wanda's bank card and driver's license in Jazz's back seat, and then threw them out of the car.
 {¶ 43} Appellant told Jazz to stop at the car wash on Meridian Road. After Jazz pulled in, appellant vacuumed the backseat and floor. When they were driving, appellant saw blood near his door handle and told Jazz to take him to his sister's house. He went in the house, came out with clothes detergent, and scrubbed the handle.
 {¶ 44} Jazz returned to her apartment. She took appellant's gun out of her arm rest and returned it to him. He had told her to put it there. Then Jazz and appellant went in her apartment. He got his shoes and jeans, gave Jazz $70, and left.
 {¶ 45} Jazz was arrested on December 30, 2005. After she plead guilty, she drove with Detective Pizzulo, directing him to the sites appellant and his accomplices went that night. The detective testified that on January 11, 2006, Jazz took him to a burnt house on Josephine in Youngstown, where Jazz said appellant had burned clothing. She took him to the intersection of Forest Glen and Edgar, where the detective found Wanda's partially burnt driver's license. Jazz showed him where appellant had stopped to get clothing. They then went to McKelvey Lake, and Jazz pointed to the area where she said appellant had thrown the crowbar and boots off the bridge.
 {¶ 46} Keyatta Riley, aka "BK," testified she met appellant in the summer of 2005. On December 19, 2005, she agreed to purchase appellant's white Plymouth Sundance. On that day, appellant told BK he had a plan to commit a robbery and she agreed to be the driver. He told her they would be stealing $50,000 from the mother of *Page 13 
his friend Rebecca. Late that night appellant and BK went to the Warren Village Apartments to pick up Rebecca. BK had never met her before. BK was driving, and Rebecca got in the back seat of the car with appellant. BK drove to Wanda's house while Rebecca gave directions.
 {¶ 47} They arrived at Wanda's house at midnight. BK pulled in the driveway and Rebecca pointed out her mother's house to them. BK then drove away. BK testified she and appellant went there with Rebecca to learn where her mother lived so they could commit the robbery. BK then drove back to Warren and dropped Rebecca off in front of her building.
 {¶ 48} Later that night, BK drove appellant back to Wanda's home. On December 20, 2005, at approximately 2:00 a.m., she pulled in the driveway. Appellant had told BK to knock on the front door and if Rebecca's mother answered, she was to say her car had broken down and to ask to use her phone to call AAA. Appellant would then come in the house, mace Rebecca's mother, and tie her up and rob her. BK knocked on the door, but no one answered. They then left and returned to Youngstown.
 {¶ 49} On December 21, 2005, BK picked up appellant in Youngstown. They agreed to make another attempt to rob Rebecca's mother that night. He told her to get two pairs of gloves for the robbery and she took them from her grandmother's house. BK drove appellant to the apartment of appellant's friend Jazz, who BK had never met before. BK and appellant then left and picked up Rebecca and BK drove them to Wanda's house. BK testified that when they arrived, they were all "paranoid" because they thought Rebecca's mother was home since the lights were on, although she was supposed to be at church. After waiting awhile, Rebecca got out of the car, went to the *Page 14 
back of the house, and then, from inside, unlocked the front door. Appellant took the gloves and went in the front door. BK testified Rebecca went to the house that night with appellant to have sex with him; she did not know she and her mother were going to be robbed. BK said she dropped appellant and Rebecca off at 7:05 p.m.
 {¶ 50} BK then returned to Warren. She said that, according to their plan, she was to go back to Jazz's apartment and wait for appellant's phone call so he could tell her he "had tied them up." According to their plan, appellant would say, "one" when he had tied Rebecca. Then BK and Jazz were to drive back out to Wanda's house to pick him up, with Jazz driving.
 {¶ 51} BK testified that at around 8:00 p.m., while she was in Warren, appellant called her on his cell phone from Wanda's house. They talked briefly and then appellant said, it was "about to be one" and hung up. He then called her back and said, "One."
 {¶ 52} Jazz then drove BK back out to Wanda's house. BK was in the passenger seat giving directions to Jazz, who had never been there before. While appellant and BK were on the phone, he said, "it's about to be two" and he hung up. Jazz and BK arrived at Wanda's house at about 9:00 p.m. Appellant called back and told BK to come in and to leave her cell phone with Jazz.
 {¶ 53} BK left the car and went in the back door of the house. Appellant said, "Be careful, they're right here." BK thought he meant they were tied up. She then walked in and saw the older woman on the floor in a large puddle of blood. She said the woman was lying on her stomach and her hair was full of blood. Appellant was standing in front of Wanda and said he shot her in the head twice. *Page 15 
 {¶ 54} Appellant gave BK Wanda's purse and cell phone and directed her to a bedroom upstairs where they emptied Wanda's purse on the bed. She asked him where Rebecca was, and he said, "Downstairs in the room." Appellant grabbed the wallet out of Wanda's purse and took the money which totaled $93. He told BK to grab whatever she needed, and she took Wanda's driver's license and credit card.
 {¶ 55} Appellant told BK to get a bed cover and a sheet for him, which she did. He told her to look in the bathroom for something flammable. Appellant then said he had found paint. BK also took another cover from the bed in another bedroom. BK testified she saw appellant drag Wanda, but BK stayed upstairs and did not see him burn her or Rebecca. She said the front of appellant's jeans, his boots, and gloves were soaked with blood.
 {¶ 56} Appellant told BK to tell Jazz to have the passenger side of the car near the back door of the house. BK called Jazz and said, "the club was about * * * to burn" because appellant was getting ready to burn Wanda and Rebecca.
 {¶ 57} Appellant and BK went out the back door. BK put the second cover on the back seat and got in the back with appellant. When appellant got in the car, he had two handfuls of cigarette butts. He said he hoped he had them all because he knew that DNA can be obtained from them. Appellant had said he liked the television crime show "CSI." He put all of Rebecca's clothes in a basket he took because he said, he had sex with her and his DNA may be on them.
 {¶ 58} In the car appellant said he wanted to rush and get the money transferred because the furnace in the back room would blow up and the house would soon be in *Page 16 
flames. He said the police would come and know it was a robbery and close Wanda's credit card.
 {¶ 59} BK testified it was just before 10:00 p.m. when they left Wanda's house. Appellant told Jazz to go to Youngstown. BK said that, while driving, "[appellant] was tripping out mentioning he had to shoot the older woman and he beat Rebecca's head with a crowbar and had sex with her." He said he choked her and then beat her. He said he shot Wanda in the head because she tried to scream.
 {¶ 60} BK testified they went to the house of appellant's cousin in Youngstown just after 10:00 p.m. to get clean clothes for appellant. They went to a vacant house where appellant burnt the basket of bloody clothes and the gloves BK had supplied. They went to McKelvey Lake where appellant threw the crowbar and his bloody boots over the bridge. Realizing these items remained sitting on the lake because it was frozen, appellant said, "Oh shit * * * F___ * * * Damn. * * * Man, why that shit sitting on top of the lake?"
 {¶ 61} Appellant said he was going to use his girlfriend Amy to do a wire transfer from Wanda's account. Before picking her up, he said that after he got the money, he was going to have to kill her.
 {¶ 62} BK called Wanda's bank and learned the balance in her account was just over $10,000. When Amy came to the car, appellant told her that when he got the $10,000, they would get married. This did not sit well with BK, who understood the money would be split three ways. BK took Amy's information and called Western Union, using Wanda's cell phone. BK gave Amy's information to the Western Union representative, who then put her on hold. When she came back on the phone, she said *Page 17 
the transfer could not be processed because she had spoken to the real card holder and BK was not the real card holder. BK testified she "hung up because [she] knew they weren't talking to the card holder being in the state that they were in when we just left * * *."
 {¶ 63} BK testified they went to the house of appellant's father in Youngstown. While there appellant tried to wash the blood off his hands. After they left appellant's father, appellant burned Wanda's credit card and driver's license with a cigarette lighter and tossed them out of the car. At midnight, they went to a car wash in Youngstown, where appellant vacuumed Jazz's car and wiped blood off the outside door handle where he had entered the car after the murders.
 {¶ 64} Next, they went to appellant's mother's house in Liberty to get bleach to clean blood on Jazz's carpet in the back seat. Appellant came out of her house with a cup of detergent and cleaned the carpet and wiped the door.
 {¶ 65} Jazz then drove back to her apartment. When they arrived there, BK saw that appellant had a small silver handgun which he gave to Jazz. Jazz and appellant then went in her apartment. Shortly thereafter, he left with BK in her car. Appellant gave BK $50 from the $93 he had stolen from Wanda's purse.
 {¶ 66} On December 29, 2005, Detective Pizzulo arrested BK at her home, and she gave a detailed written statement on that date. She plead guilty on January 6, 2006.
 {¶ 67} Amy Corll testified she met appellant in 1996. She is in love with him and, to show her commitment to him, she had his nickname, "Maniac," tattooed on her arm. In December, 2005, Amy was pregnant by appellant. On December 21, 2005, at about *Page 18 
10:00 p.m., he called her where she worked at Denny's Restaurant. He said he had $10,000 and if she wanted to marry him, she had to leave work now and meet him. He told her to bring a shirt, pants, socks, and a hooded sweatshirt for him, along with her identification. When they arrived at Amy's house in Hubbard, Ohio, Amy sat in the back seat with appellant. He was wearing a big coat with a fur collar, but he did not have on a shirt. She had never met Jazz or BK.
 {¶ 68} Appellant asked Amy if she would accept a wire transfer from BK's credit card and she agreed. BK called Western Union and said she wanted to transfer $9,700 to Amy. The agent refused to make a transfer, saying she had talked to the real card holder. Appellant said she could not have talked to the real card holder and everyone in the car became nervous.
 {¶ 69} Appellant said he wanted to go to his father's house to use his car. Appellant was praying in the car. He said, "Forgive me for my sins for they're tremendous. Please watch over the families of everyone in this car."
 {¶ 70} Appellant and the three women stayed at his father's house awhile until appellant had his father drive Amy home. Before she left, appellant pulled Amy back and said he had killed two people. He said he burned their bodies and if they were not recognizable, he would be ok, but if they were, he was in trouble and that she should watch the news. Appellant asked her what to use to get blood off his hands. He had washed them with bleach, but he was afraid the blood could still be seen under an ultraviolet light. Amy testified appellant watched CSI on TV and every episode deals with DNA and blood. *Page 19 
 {¶ 71} Amy was later arrested and entered a plea agreement. At around that time, appellant had a friend bring Amy letters appellant had written that implicated Amy's cousin in these murders. He wanted Amy to copy them in her handwriting and then send them to the media. He said it would create doubt. He told her if she did it, she would get $10,000, but if she did not, "he might die." Amy refused to comply.
 {¶ 72} According to their cell phone records, on December 21, 2005, between 6:00 p.m. and 9:00 p.m., appellant and BK made numerous phone calls to each other. Specifically, at 8:02 p.m., appellant called BK. This coincides with BK's testimony that around 8:00 p.m., appellant called her and said, "one."
 {¶ 73} Appellant's cell phone records show he called BK at 8:12 p.m., 8:28 p.m., 8:46 p.m., and 9:02 p.m. Appellant's last two calls to BK coincide with her testimony that appellant called her at about 9:00 p.m. saying, "it's about to be two" and his call to her shortly thereafter while she was in Wanda's driveway, telling her to come in the house.
 {¶ 74} Jazz's cell phone records show that a call was made from her phone to Amy on December 21, 2005, at 10:00 p.m. This coincides with Amy's testimony that appellant called her at about 10:00 p.m.
 {¶ 75} Wanda's cell phone records show her phone was used to call Western Union five times between 11:01 p.m. and 11:09 p.m., with the last call lasting 54 minutes. This coincides with BK's testimony that she called Western Union multiple times using Wanda's phone and that the last call lasted a long time.
 {¶ 76} Jennifer Brindisi, news reporter for Channel 27 News, testified that on December 23, 2005, at about 4:00 p.m., she was on assignment on Stacey Avenue in *Page 20 
Youngstown with her cameraman when she was approached by a male who stated they should look over the bridge. Shortly thereafter, they started to drive back to the TV station. When crossing the bridge over nearby McKelvey Lake, a dumping spot for Youngstown crimes, they decided to stop and look over the bridge. She saw sitting on the frozen lake below a pair of work boots and a towel with a crowbar sticking out of it. The front part of the boots appeared to be covered in blood and it looked like there was blood on the towel. She called the Youngstown Police Department, whose officers retrieved the items, which included a throw rug, and submitted them to Detective Pizzulo, who in turn submitted them to BCI for analysis.
 {¶ 77} Detective Zaida Miranda of the Youngstown Police Department testified that on January 1, 2006, the officers were told to be on the lookout for a suspect in a double homicide in Newton Falls, identified as appellant. Later that day Detective Miranda responded to 61 Halleck on a call of a suspicious vehicle. While there a neighbor told her that appellant may be at 71 Halleck. She requested backup and four uniformed officers secured a perimeter around that residence.
 {¶ 78} As Detective Miranda walked along the residence, she heard a gunshot and asked for more units. She then heard someone yell, "I have hostages, I will kill them." Appellant fired a shotgun twice from inside the house. Detective Miranda and her partner took cover behind a tree. The officers were pinned behind that tree because appellant was shooting from the house. Detective Miranda and her partner attempted to run from the tree to her cruiser three times, but each time heard a shotgun blast hit the tree, so they were forced to stay there. The gunfire continued for three hours until they *Page 21 
were rescued by a bulletproof tactical vehicle. There were 100 officers involved in the standoff. The only person in the house was appellant.
 {¶ 79} Officer David Wilson, hostage negotiator with the Youngstown Police Department, was sent to assist officers pinned down by someone firing a gun. On arrival, he spoke to appellant's mother, who said her son was in the house. She gave the officer appellant's cell phone number. He called appellant, who was irate and demanding to see his children. Officer Wilson told appellant a warrant had been issued for him. Appellant said he had a female gagged and tied up. He said he had flammable liquid in the house; he was going to set the house on fire; and "come outside with his weapon and the officers would have to shoot him, suicide by cop."
 {¶ 80} After appellant's cell phone went dead, Officer Wilson used the PA system in the tactical vehicle to talk appellant out of the house and he was arrested. After his arrest, Youngstown police recovered in the house a .12 gauge shotgun and a .22 caliber handgun, the latter of which Jazz identified as belonging to appellant and which, according to BCI, had his blood on it.
 {¶ 81} Brian Peterman, a fire investigator with the State Fire Marshall's Office, went to the scene of the murders on December 22, 2005. He collected paint cans near the bodies, a paint can lid, and some clothing from one of the bodies that was covered in a brown material, all of which contained a petroleum distillate found in fire starters. He concluded the origin of the fire was where the two victims were laying. The cause of the fire was an intentional act of one placing the victims on the basement floor, putting debris on them, pouring the deck stain on them, and deliberately setting them on fire. *Page 22 
 {¶ 82} Christopher Smith, forensic biologist at BCI, concluded the stains on the throw rug, crowbar, and boots retrieved from McKelvey Lake on December 23, 2005 were blood. He also took swabs of the blood and swabs from inside the boots for DNA testing.
 {¶ 83} Brenda Gerardi, forensic scientist in the serology DNA section at BCI, testified that DNA, which stands for deoxyribonucleic acid, is a molecule which contains the genetic code for life. It is found in all living cells and is unique to each individual. Due to its uniqueness, BCI can compare an unknown sample found at a crime scene to a known sample.
 {¶ 84} The DNA profile from the cigarette butt taken from near the furnace room by Detective Pizzulo is consistent with appellant. The expected frequency of occurrence of the DNA profile is one in more than 57 quintillion. The DNA profile from the crowbar is consistent with Wanda. The expected frequency of occurrence of the DNA profile identified on the crowbar is one in more than 23 quintillion.
 {¶ 85} The DNA profile from the blood stain on the right boot was a mixture consistent with Wanda and Rebecca. The expected frequency of occurrence of the mixed DNA profile from this stain is one in 94 billion 970 million.
 {¶ 86} As to the stain on the outside of the left boot, the major profile (greater concentration) is consistent with Wanda, and the minor profile is consistent with Rebecca. As to the stain that is consistent with Wanda, the expected frequency of occurrence of Wanda's DNA profile is one in more than 23 quintillion people. The expected frequency of occurrence of Rebecca's DNA profile is one in one billion 546 million people. *Page 23 
 {¶ 87} The DNA profile from the interior of the left boot is also a mixture. The major DNA profile is consistent with appellant. Wanda and Rebecca are a minor source (lesser concentration) and appellant is the major source of DNA from the interior of the left boot. The expected frequency of occurrence of the major profile from the interior of the left boot is one in 813,700,000 people.
 {¶ 88} The jury returned a verdict finding appellant guilty of count two, aggravated murder in the commission of a felony of Rebecca with specifications of aggravating circumstances; count three, aggravated murder with prior calculation and design of Wanda with specifications of aggravating circumstances, but not guilty as to specification number four (kidnapping); count four, aggravated murder in the commission of a felony of Wanda with specifications of aggravating circumstances, but not guilty as to specification number four (kidnapping); count five, aggravated burglary; count six, aggravated robbery; count seven, kidnapping; and count nine, aggravated arson. The jury returned a verdict of not guilty on count one, aggravated murder with prior calculation and design of Rebecca, and count eight, the kidnapping of Wanda.
 {¶ 89} On November 16, 2006, the state dismissed count three. A mitigation hearing with respect to counts two and four was conducted on that date, and the jury, on November 20, 2006, recommended that two sentences of life imprisonment without parole be imposed on appellant.
 {¶ 90} On November 29, 2006, the trial court held a sentencing hearing, and on December 11, 2006, sentenced appellant to serve a term of life imprisonment without parole on count two, life imprisonment without parole on count four, ten years on count *Page 24 
five, ten years on count six, ten years on count seven, and eight years on count nine, all sentences to run consecutively to each other.
 {¶ 91} Appellant appeals his conviction asserting sixteen assignments of error.
 {¶ 92} Appellant states for his first assignment of error:
 {¶ 93} "THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR MISTRIAL WHEN A WITNESS FOR THE STATE TESTIFIED THAT SHE TOOK A POLYGRAPH EXAMINATION AS REQUIRED BY HER PLEA AGREEMENT PRIOR TO TRIAL."
 {¶ 94} Appellant argues the trial court erred in denying his motion for a mistrial when, in responding to a general question about her plea bargain, Keyatta Riley stated that its most important condition was that she take a polygraph test.
 {¶ 95} "The determination of whether to grant a mistrial is in the discretion of the trial court." State v. Ahmed, 103 Ohio St.3d 27, 42,2004-Ohio-4190. The trial judge is in the best position to determine whether the situation in the courtroom warrants the declaration of a mistrial. State v. Glover (1988), 35 Ohio St.3d 18, 19. A reviewing court will not second-guess such determination absent an abuse of discretion. Ahmed, supra. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 96} Further, a mistrial should only be declared when the ends of justice so require and a fair trial is no longer possible. State v.Franklin (1991), 62 Ohio St.3d 118, 127. It is well settled that when the trial court gives a curative instruction shortly after an error occurs at trial, the jury can be presumed to have followed the court's instruction, *Page 25 
including instructions to disregard testimony. State v. Loza,71 Ohio St.3d 61, 75, 1994-Ohio-409.
 {¶ 97} Our review of the record reveals that, on October 27, 2006, following several hours of direct examination, in eliciting from Ms. Riley the details of her plea bargain, she explained that she was charged with complicity to commit aggravated robbery, complicity to commit aggravated burglary, and complicity to commit kidnapping. At that time she had plead guilty and was awaiting sentence. At one point the prosecutor asked her, "what was the most important condition you had to meet?" and she responded, "Submit to a polygraph."
 {¶ 98} Defense counsel immediately objected and moved for a mistrial. The prosecutor stated that, although her plea agreement required her to take a polygraph examination, he had instructed Ms. Riley not to mention the polygraph and that he expected her to answer, "to say the truth." The prosecutor then requested a curative instruction.
 {¶ 99} The trial court decided to research the issue before ruling on the motion for mistrial, but immediately gave a curative instruction. The court stated to the jury: "Ladies and gentlemen of the Jury, you will ignore the last remark and not consider it for any purpose in this case."
 {¶ 100} On October 31, 2006, the trial court, finding no prejudicial error, denied the motion because: (1) the court immediately gave a curative instruction; (2) the court found the mention of the polygraph by the witness was inadvertent and in response to the prosecutor's general question as to what she thought was the most important aspect of her plea bargain; (3) there was no additional reference to the polygraph test by any *Page 26 
witness; (4) the court found the reference was not an attempt to bolster Ms. Riley's credibility and that her response was not anticipated by the state; and (5) no test results were admitted and there was no mention that she even took the test.
 {¶ 101} The Ohio Supreme Court addressed this issue in a case arising out of this district. In State v. Jones, 91 Ohio St.3d 335,2001-Ohio-57, the state had asked its witness if he had taken a lie detector test. Defense counsel objected, but before the court could rule, the witness said he had. The trial court instructed the jury to disregard the answer. Defense counsel moved for a mistrial, which the court denied. The Court held: "we find no error in the trial court's reliance upon curative instructions and its refusal to grant a mistrial * * *. The jury is presumed to have followed the court's instructions." Id. at 344.
 {¶ 102} In the case sub judice, the reference to the polygraph was inadvertent and immediately followed by a curative instruction from the trial court. Further, there was no mention of test results or even that Ms. Riley took the polygraph. Accordingly, we cannot find the trial court abused its discretion when it denied appellant's motion for mistrial.
 {¶ 103} Appellant's first assignment of error is not well taken.
 {¶ 104} For his second assignment of error, appellant contends:
 {¶ 105} "THE TRIAL COURT ERRED BY ALLOWING THE STATE TO INTRODUCE EVIDENCE REGARDING AN ALLEGED SHOOT OUT THAT TOOK PLACE ALMOST TWO WEEKS AFTER THE CRIME THAT APPELLANT WAS CHARGED [SIC]." *Page 27 
 {¶ 106} Appellant argues that his efforts to avoid arrest on January 1, 2006, 11 days after the murders, is tantamount to evidence of flight and was inadmissible because: (1) it was too remote in time from his crimes and (2) he was unaware he was wanted for aggravated murder. We do not agree.
 {¶ 107} Initially, we note that the admission or exclusion of relevant evidence rests within the discretion of the trial court. State v.Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus.
 {¶ 108} "`It is to-day universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, * * * and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.'" State v. Alexander (Feb. 26, 1987), 8th Dist. No. 51784, 1987 Ohio App. LEXIS 7187, *4-*5, quoting State v.Eaton (1969), 19 Ohio St.2d 145, 160, citing 2 Wigmore on Evidence (3 Ed.), 111, Section 276.
 {¶ 109} In Alexander, supra, the defendant argued that because six months had passed between the offense and his flight, the evidence of his flight had little probative value. In rejecting this argument, the Eighth Appellate District held: "Admissibility of evidence of flight has not been made contingent upon how much time passes between the offense and the defendant's flight." Id. at *5. The court noted that "flight on the eve of trial can carry the same inference of guilt as flight from the scene." Id.
 {¶ 110} Further, the record demonstrates appellant was aware the police were looking for him. Jazz testified that on December 29, 2005, appellant came to her apartment looking scared. He said Amy had called him and tried to get him to talk about what he had done. He said he thought the police had put her up to this so he *Page 28 
hung up on her. He also said BK had called him and left a message saying, "they got me." Appellant said, "I'm gonna have a standoff with [the police]. * * * I want them to kill me."
 {¶ 111} After the police formed a perimeter around appellant's house on January 1, 2006, he started shooting at the officers, yelling he had hostages and would kill them. He continued the standoff for three hours. After the hostage negotiator told appellant a warrant had been issued for him, appellant continued the standoff and said he was going to set the house on fire, come out with his gun drawn and force the officers to kill him. There was thus ample evidence that appellant was aware the police were looking for him in connection with his murder of Wanda and Rebecca when he engaged them in a standoff prior to his arrest. We hold the trial court did not abuse its discretion in admitting evidence of appellant's arrest.
 {¶ 112} Appellant's second assignment of error is not well taken.
 {¶ 113} For his third assignment of error, appellant asserts:
 {¶ 114} "THE TIRAL [SIC] COURT ERRED BY PERMITTING APPELLEE TO DISMISS A PROSPECTIVE BLACK JUROR THROUGH A PREEMPTORY [SIC] CHALLENGE WITHOUT SATISFYING THE MANDATES OF BATSION [SIC] V. KENTUCKY."
 {¶ 115} Appellant argues the state violated his equal protection rights by not having a race-neutral reason for its use of one peremptory challenge to a potential juror who was African-American.
 {¶ 116} The United States Supreme Court established a three-part test in evaluating whether a peremptory challenge is racially motivated inBatson v. Kentucky *Page 29 
(1986), 476 U.S. 79. Under this test, the defendant must first make a prima facie showing of discrimination in the selection of a jury by showing the prosecutor exercised a peremptory challenge to strike a juror due to his race. Id. at 96. The Ohio Supreme Court has held that in determining whether a prima facie case exists, the litigant must show an inference of racial discrimination by the striking party. Hicks v.Westinghouse, 78 Ohio St.3d 95, 98, 1997-Ohio-227. In making this determination, the trial court should consider all relevant circumstances, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present. Id.
 {¶ 117} The only basis asserted by appellant in support of his prima facie showing is that there was just one other African-American jury member. The trial court stated: "Numbers are not the issue * * *. You must demonstrate * * * through * * * questions, other jurors, strikes, * * * the questioning. None of that's been demonstrated to the Court in this case to show that there's a prima facie case." Based on our review of the record, we perceive no circumstances from which an inference of racial discrimination could be drawn.
 {¶ 118} Moreover, the prosecutor offered race-neutral reasons for his use of the peremptory challenge: (1) the juror indicated that in a capital case he would want more proof than would be necessary to prove a case beyond a reasonable doubt; (2) the juror quoted from the Bible that we should love the person and hate the sin and show forgiveness; and (3) the juror is employed as a drug counselor working with people appellant's age in drug treatment. Because appellant is a drug user, the prosecutor expressed concern that since the juror works at rehabilitating drug-dependent persons, *Page 30 
he would tend to identify with appellant. The trial court considered the prosecutor's explanation and defense counsel's argument in opposition, and found appellant had not proven purposeful discrimiantion.
 {¶ 119} In United States v. Davis (C.A. 8, 1998), 154 F.3d 772, the government's attorney stated he struck the juror because he was a chemical dependency counselor. In holding the district court did not err in accepting the government's race-neutral explanation, the court held: "A chemical dependency counselor * * * would presumably have a history working with current drug users, which the government could reasonably believe would affect her assessment of some witnesses who are themselves drug users." Id. at 782. We find the reasoning of the Eighth Circuit to be persuasive.
 {¶ 120} Appellant's third assignment of error is not well taken.
 {¶ 121} Appellant's fourth assignment of error alleges:
 {¶ 122} "THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING TESTIMONY REGARDING DNA FROM A WITNESS WHEN THERE WAS LACK OF FOUNDATION AND LACK OF QUALIFICATION OF THE TESTIFYING WITNESS."
 {¶ 123} Appellant argues the state failed to qualify Brenda Gerardi, a forensic scientist in BCI's serology DNA section, as an expert in genetics. He argues she was therefore not qualified to testify about the expected frequency of occurrence of the DNA profiles of appellant, Wanda, and Rebecca from the state's evidence. Evid. R. 702 provides in pertinent part:
 {¶ 124} "A witness may testify as an expert if all of the following apply:
 {¶ 125} "* * * *Page 31 
 {¶ 126} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony * * *."
 {¶ 127} The decision whether to qualify a witness as an expert is a matter within the sound discretion of the trial court. State v.Browne (June 27, 1997), 11th Dist. No. 96-L-121, 1997 Ohio App. LEXIS 2810, *12. Rulings on such matters will not be reversed unless the court abuses its discretion. Id. A reviewing court may not substitute its judgment on appeal for that of the trial court. Id. at *17.
 {¶ 128} Evid. R. 702 allows witnesses to testify as experts if they have acquired special knowledge through study or practical experience or both. State Auto Mut. Ins. Co. v. Chrysler Corp. (1973),36 Ohio St.2d 151, 160. The determination whether a witness has the education or experience necessary to become an expert witness must be made on a case-by-case basis. Browne, supra, at *13.
 {¶ 129} Ms. Gerardi testified she has been a forensic scientist in BCI's serology DNA section for ten years. Her duties are to analyze physical evidence for the identification of physiological fluids and the DNA analysis of these samples.
 {¶ 130} She testified she has an associate of science degree and a bachelor of science degree in biology from Kent State University. She has completed continuing education in moleculor biology, biochemistry,genetics, and statistics. She completed two years of training at BCI in the areas of identifying physiological fluids and DNA analysis and interpretation. She has also completed a course conducted by the FBI Academy in Virginia on DNA analysis and interpretation. She testified she has performed thousands of forensic biology analyses, and has performed hundreds of DNA comparisons. *Page 32 
 {¶ 131} Ms. Gerardi testified BCI has several procedural steps its scientist are required to follow as well as technical and administrative reviews of their data and interpretation. She testified concerning the procedure BCI follows in making a DNA analysis and comparison, including the removal, quantification, amplification, and data interpretation where BCI compares the unknown DNA sample to the known sample. She explained that BCI ensures the results are reliable by having several checks and balances in place at each of these procedural steps, including positive and negative controls, to ensure that each test is working properly and that the results are interpreted reliably.
 {¶ 132} Ms. Gerardi testified that in addition to determining whether a known DNA profile is consistent with a sample taken at a crime scene, BCI can determine the "significance of the results," i.e., the expected frequency of occurrence of the DNA profile identified from evidence obtained at the crime scene.
 {¶ 133} Ms. Gerardi testified concerning her training and experience in statistical calculations. She said she has taken all the classses that are required for DNA analysis to do statistical interpretation. She has been trained by the FBI concerning statistics and she has had continuing education in this area.
 {¶ 134} Based upon our review of the record, we hold the trial court did not abuse its discretion in allowing her to testify as an expert.
 {¶ 135} Appellant's fourth assignment of error is not well taken.
 {¶ 136} Appellant asserts for his fifth assignment of error: *Page 33 
 {¶ 137} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY ALLOWING PHOTOGRAPHS OF THE DECEASED TO BE ADMITTED INTO EVIDENCE."
 {¶ 138} Appellant argues that all of the photos of the victims should have been excluded because they were gruesome and their prejudicial impact exceeded their probative value.
 {¶ 139} Under Evid. R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. State v. Biros,78 Ohio St.3d 426, 444, 1997-Ohio-204.
 {¶ 140} It is well settled that properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of prejudice is outweighed by their probative value and the photographs are not repetitive or cummulative in number. State v.Maurer (1984), 15 Ohio St.3d 239, paragraph seven of the syllabus.
 {¶ 141} In the case sub judice, the court admitted 14 photographs of Rebecca and Wanda taken at the coroner's office (eight of Rebecca and six of Wanda) and ten photographs of the victims taken at the crime scene. The coroner's photographs were used to corroborate and illustrate Dr. Germaniuk's testimony concerning the cause of death. These photos showed the victims were severely burnt and their limbs had been thermally amputated. They showed Rebecca had been beaten and sustained multiple blunt force trauma to the face and skull consistent with the crowbar retrieved from McKelvey Lake. The photographs showed the ligature that had been tied around *Page 34 
Rebecca's neck and mouth, and thus illustrated the secondary cause of death, i.e., asphyxiation. These photographs also documented Dr. Germaniuk's conclusion that 80 per cent of Wanda's body and one-half of her skull had been destroyed by fire, precluding a specific determination of the actual cause of death.
 {¶ 142} Further, the photographs taken at the crime scene illustrated the officers' testimony concerning it. They showed the location of the initial attack of both victims, the trails of blood they left behind as they were dragged across the basement and into the furnace room. They showed the debris thrown on top of the victims and the paint used to burn them. They showed the ligature wrapped around Rebecca's mouth and neck as she lay under the oil tank, the clothing worn by Wanda, and the nude condition in which Rebecca was left to burn. They also showed the jewelry worn by the victims, which assisted in their identification. In addition, the photographs corroborated the accomplice testimony that appellant beat Rebecca with a crowbar and burned both bodies.
 {¶ 143} Nevertheless, appellant would have us believe that none of the photographs indicated the time, place, or manner of death, and that they had no relevance in the case. However, the record belies appellant's assertions.
 {¶ 144} Because the photographs showed the condition of the bodies and crime scene and are probative of the contested issues of intent, purpose, motive, and the cause, manner, and circumstances of the victims' deaths, they were highly probative and the value of that evidence clearly outweighed the danger of unfair prejudice. We therefore hold the trial court did not abuse its discretion in admitting the photographs into evidence. *Page 35 
 {¶ 145} Appellant's fifth assignment of error is not well taken.
 {¶ 146} Appellant contends for his sixth assignment of error:
 {¶ 147} "THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR A CHANGE OF VENUE."
 {¶ 148} Appellant argues the trial court erred in denying his motion for change of venue because extensive pretrial publicity made it impossible to seat an impartial jury in the county where appellant's trial took place.
 {¶ 149} A motion for change of venue is governed by Crim. R. 18(B), which provides that "[u]pon the motion of any party * * * the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending."
 {¶ 150} Crim. R. 18(B) does not require a change of venue merely because of extensive pretrial publicity. State v. Landrum (1990),53 Ohio St.3d 107, 116-117. The decision to grant or deny a change of venue is in the discretion of the trial court. Id. at 116. Further, a careful and searching voir dire provides the best test of whether pretrial publicity has prevented the defendant from obtaining a fair and impartial jury from the locality. Id. at 117. A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. State v Gross 97 Ohio St.3d 121, 128,2002-Ohio-5524. Only in rare cases may prejudice be presumed. Mayola v.Alabama (C.A. 5, 1980), 623 F.2d 992, 997. Finally, where it appears that jurors' opinions as to the guilt of the defendant are not fixed but would yield readily to evidence, it is not error to deny a motion for change of venue, in the absence of a clear *Page 36 
showing of an abuse of discretion. State v. Swiger (1966),5 Ohio St.2d 151, paragraph one of the syllabus.
 {¶ 151} Initially, we note there is no evidence in the record that the publicity in the case was so pervasive, it impaired the ability of the jurors to deliberate fairly and impartially. State v. Treesh (2001),90 Ohio St.3d 460, 464. Appellant has not cited the testimony of any juror indicating that he could not be fair and impartial. Thus, appellant has failed to demonstrate that any seated juror was not impartial.
 {¶ 152} Our review of the record reveals that the trial court questioned potential jurors about their exposure to pretrial media coverage of the case. From the original jury panel, only three jurors who had read, heard, or watched news coverage of the case or appellant's standoff with the police were seated on the final panel. Each of these three stated they had not formed an opinion as to appellant's guilt and could be fair and impartial. We note that appellant passed for cause on each of these jurors.
 {¶ 153} Based on the foregoing, we cannot say the trial court abused its discretion in denying appellant's motion for change of venue.
 {¶ 154} Appellant states for his seventh, eighth, ninth, tenth, and eleventh assignments of error:
 {¶ 155} "[7] THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE OF BURGLARY THUS DENYING APPELLANT OF [SIC] HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL.
 {¶ 156} "[8] THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF ROBBERY THUS DENYING APPELLANT OF [SIC] HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL. *Page 37 
 {¶ 157} "[9.] THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE OF THEFT THUS DENYING APPELLANT OF [SIC] HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL
 {¶ 158} "[10] THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE OF ABDUCTION THUS DENYING APPELLANT OF [SIC] HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL.
 {¶ 159} "[11.] THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE OF UNLAWFUL RESTRAINT THUS DENYING APPELLANT OF [SIC] HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL."
 {¶ 160} Because the issues raised in these assignments of error are interrelated, we shall consider them together. "An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot * * * ever be committed without the lesser offense * * * also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." State v. Deem (1988),40 Ohio St.3d 205, paragraph three of the syllabus; State v. Meeks, 11th Dist. No. 2007-L-057, 2007-Ohio-6559, at ¶ 21.
 {¶ 161} "Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." State v. Thomas (1988), 40 Ohio St.3d 213, paragraph two of the syllabus. An instruction on a lesser included offense is not required unless there is evidence to controvert the state's evidence of the element of the greater offense that is not required to prove the lesser offense. Meeks, *Page 38 
supra, at ¶ 31. Further, an instruction on the lesser included offense is not warranted where the evidence presented on behalf of the defendant is such that if accepted by the jury it would constitute a complete defense to all elements of the crime charged. State v. Nolton (1969),19 Ohio St.2d 133, syllabus. In State v. Keenan, 81 Ohio St.3d 133,1998-Ohio-459, the Court held: "where a defendant presents a complete defense to the substantive elements of the crime, * * * an instruction on a lesser included offense is improper." Id. at 139. Where the defendant completely denies any involvement in the crime, he is not entitled to an instruction on a lesser included offense. State v. Stewart (Nov. 19, 1998), 8th Dist. No. 73255, 1998 Ohio App. LEXIS 5462, *25.
 {¶ 162} The foregoing authority applies to each of these assignments of error because: (1) no evidence was presented that would reasonably support both an acquittal on the crime charged and a conviction on the lesser offense, and (2) appellant presented a complete defense to all elements of the crimes charged and denied any involvement in these offenses. As a result, appellant was not entitled to a jury charge on any of the requested lesser offenses.
 {¶ 163} Under his seventh assignment of error, appellant argues the trial court erred in refusing to instruct the jury on the lesser included offense of burglary. There is no doubt that burglary is a lesser included offense of aggravated burglary since the common elements of both offenses are (a) trespass in an occupied structure (b) by force, stealth, or deception (c) when another person is present (d) with purpose to commit any criminal offense. R.C. 2911.11 and R.C. 2911.12. The additional element of inflicting physical harm or having a deadly weapon is found only in the greater offense of aggravated burglary. R.C. 2911.11(A)(1) and (2). *Page 39 
 {¶ 164} There is no evidence in this case that appellant trespassed into Wanda's home to steal, but not to inflict physical harm and without a deadly weapon. The uncontradicted evidence established that in trespassing into Wanda's residence and stealing her property, appellant murdered her and her daughter and used a gun and a crowbar. Because there was no evidence that would reasonably support a conviction of burglary and an acquittal of aggravated burglary, appellant was not entitled to a charge on burglary. Thomas, supra. Further, at trial appellant denied any involvement in these crimes. For this additional reason, he was not entitled to a burglary charge. Nolton, supra.
 {¶ 165} Appellant argues the testimony of his accomplices was conflicting regarding his possession of the gun so that the jury could have convicted him of burglary. Jazz testified appellant had given her his gun to keep in her console until she returned it to him at the end of the night when she dropped him off. BK testified that at the end of the night, she saw appellant had a gun and gave it to Jazz. There was no evidence that appellant did not have the gun while at Wanda's home. As a result, any inconsistency is not material. We note that appellant does not address the record evidence that he used a crowbar as a deadly weapon in the commission of these crimes.
 {¶ 166} Under appellant's eighth assigned error, he argues the trial court erred in refusing to instruct the jury on the lesser included offense of robbery.
 {¶ 167} The offense of robbery prohibits a defendant from committing a theft offense while having a deadly weapon or inflicting physical harm. R.C. 2911.02. However, in order to find appellant guilty of aggravated robbery, the jury had to find that *Page 40 
appellant inflicted serious physical harm on Wanda and Rebecca or that he used a deadly weapon. R.C. 2911.01.
 {¶ 168} There is no evidence in the record that appellant robbed the victims without inflicting serious physical injury or without using a deadly weapon. Thus, there was no evidence that would have reasonably supported a conviction of robbery and an acquittal of aggravated robbery. Appellant was thus not entitled to a robbery charge.Thomas, supra.
 {¶ 169} Further, appellant did not take the position at trial that he committed a robbery, but that he did not commit aggravated robbery. Instead, as noted supra, appellant put forth a complete defense, denying any involvement and all elements of the crimes charged. For this additional reason, he was not entitled to a robbery instruction.Nolton, supra.
 {¶ 170} Appellant again argues that because the accomplice testimony concerning his gun was conflicting, the jury could have convicted him of robbery. As we discussed in our analysis under appellant's seventh assigned error, this alleged inconsistency is not material as it did not challenge appellant's use of a gun during the commission of his crimes.
 {¶ 171} Appellant also argues that because the theft occurred after Wanda's death, the jury could have found him guilty of robbery and acquitted him of aggravated robbery. However, the Supreme Court of Ohio has held: "The victim of an aggravated robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation.'" Biros, supra, at 451, quoting State v. Smith (1991),61 Ohio St.3d 284, *Page 41 
290. Appellant's intent to steal need not have preceded the murder for purposes of R.C. 2903.01(B) and 2929.04(A)(7). Biros, supra.
 {¶ 172} Under appellant's ninth assignment of error, he argues the trial court erred in not charging the jury on theft as a lesser included offense of aggravated robbery. Theft merely requires the defendant to exert control over the victim's property, R.C. 2913.02, while aggravated robbery requires a finding that the defendant, during the commission of a theft offense, inflicted serious physical harm or used a deadly weapon. R.C. 2911.01.
 {¶ 173} There is no evidence in the record that appellant stole Wanda's property without inflicting serious physical harm on her and without a deadly weapon, i.e., the gun and crowbar. Appellant relies on a portion of BK's testimony wherein she stated that, under appellant's direction, they went through Wanda's purse and stole her cash, driver's license, and credit card. However, appellant ignores BK's further testimony that: (1) appellant admitted he shot Wanda in the head; (2) she saw Wanda in a large pool of blood, (3) she saw appellant drag Wanda; (4) she knew appellant was preparing to incinerate Wanda and Rebecca, and (5) BK saw appellant leave the house with a crowbar which later turned out to be stained in Wanda's blood. Because there is no evidence that would reasonably support a finding that appellant was guilty of theft but not guilty of aggravated robbery, appellant was not entitled to a theft charge. Thomas, supra. Further, because appellant took the position at trial that he was not involved in these crimes and asserted a complete defense, denying all elements of the crimes charged, he was not entitled to a theft charge. Nolton, supra. *Page 42 
 {¶ 174} Under appellant's tenth assignment of error, he argues the trial court erred in not charging the jury on abduction, a lesser included offense of kidnapping. Abduction requires that one remove the victim from the place where he was found or restrain the victim under a risk of physical harm, R.C. 2905.02, whereas kidnapping requires that the removal or restraint be done to facilitate the commission of a felony, to terrorize, or to inflict serious physical harm on the victim. R.C. 2905.01.
 {¶ 175} First, we note that the jury found appellant not guilty of kidnapping of Wanda so he suffered no prejudice with respect to the refusal of the trial court to charge on abduction on that count . As a result, with respect to that count, his argument is not well taken. In any event, the uncontradicted evidence in the record showed that appellant tied up Rebecca, severely beat her in the head with a crowbar, causing multiple fractures resulting in her death. This evidence supported the jury's finding that appellant removed or restrained Rebecca to facilitate the commission of a felony, to terrorize, and/or to inflict serious physical harm.
 {¶ 176} Appellant is incorrect when he suggests that Jazz testified from her own knowledge that Rebecca owed appellant money and wanted to go to her mother's house to get money to give to appellant. Jazz merely testified that this is what appellant told her to explain the reason for their trip to Wanda's house.
 {¶ 177} We are not persuaded by appellant's argument that it was impossible for appellant to be convicted of kidnapping because Rebecca invited appellant in the house. If we were to accept this argument, appellant could also not be convicted of abduction because Rebecca's allowing him to enter the house would be inconsistent with appellant's removing her from the place where she was found or restraining her *Page 43 
under a risk of physical harm, which is required for abduction. In any event, BK testified Rebecca did not know she and her mother were intended by appellant to be the victims of a robbery. She said Rebecca believed she was allowing appellant into her mother's home to have sex. Appellant also admitted to Jazz that he had sex with Rebecca so he would be able to attack her.
 {¶ 178} Appellant would have us believe that because Rebecca voluntarily opened the door to him, she consented to him tying her up, choking her, beating her with a crowbar to the point of death, murdering her mother, and setting their bodies on fire. Of course, as BK testified, Rebecca was unaware of appellant's true intention when she opened the door to him; otherwise, she never would have done so. Appellant's argument is not supported by any authority and is illogical and we reject it.
 {¶ 179} No evidence was presented that appellant committed an abduction, but not kidnapping. Thus, there was no evidence that would reasonably support a conviction of abduction and an acquittal of kidnapping. Thomas, supra. Also, appellant denied any involvement in these crimes, and for this additional reason, he was not entitled to an abduction charge. Nolton, supra.
 {¶ 180} Under appellant's eleventh assignment of error, he argues the court erred in refusing to instruct the jury on the lesser included offense of unlawful restraint. That offense merely requires a finding that the defendant restrained another of his liberty. R.C. 2905.03. Appellant again argues that because Rebecca let him in Wanda's house, he could not be guilty of restraining her. For the reasons set forth in our analysis under appellant's tenth assigned error, we reject this argument. *Page 44 
 {¶ 181} As noted supra, the defense strategy in this case was to discredit his accomplices and to deny any involvement in these crimes. Thus, contrary to appellant's argument, he was not entitled to an instruction on unlawful restraint. Nolton, supra. This court rejected this argument in State v. Totarello, 11th Dist. No. 2002-L-147,2004-Ohio-1175, in which this court held: "* * * Totarella did not put on a defense but, rather, argued that the testimony demonstrated that [the victim] Holton had voluntarily left with Totarella. If the jury had accepted Totarella's interpretation of the testimony, it could not have convicted him of the lesser offense of unlawful restraint anyway. * * * For the foregoing reasons, the trial court did not err by refusing to instruct on the lesser included offense of unlawful restraint." Id. at ¶ 56.
 {¶ 182} Likewise in this case, because appellant denied any involvement, if the jury believed him, he could not have been convicted of unlawful restraint or of kidnapping. There was no evidence on which the jury could have reasonably convicted him of unlawful restraint and acquitted him of kidnapping. Thus, the trial court did not err in refusing to charge the jury on unlawful restraint.
 {¶ 183} Appellant's seventh, eighth, ninth, tenth, and eleventh assignments of error are not well taken.
 {¶ 184} For his twelfth assignment of error, appellant contends:
 {¶ 185} "THE APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS PURSUANT TO THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION." *Page 45 
 {¶ 186} Appellant argues that because his trial counsel failed to object or failed to state certain grounds in support of his objections, his counsel was ineffective. We do not agree.
 {¶ 187} The standard of review for ineffective assistance of counsel is whether the representation of trial counsel fell below an objective standard of reasonableness and whether the defendant was prejudiced as a result of the deficient performance. The defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial.Strickland v. Washington (1984), 466 U.S. 668.
 {¶ 188} The Supreme Court in Strickland held:
 {¶ 189} "* * * In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. * * *
 {¶ 190} "Judicial scrutiny of counsel's performance must be highly deferential. * * * A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 688-689.
 {¶ 191} There is a strong presumption that the attorney's performance was reasonable. Id. Generally, the failure to object is viewed as a trial strategy and will not establish a claim of ineffective assistance of counsel. State v. Hunt (1984), 20 Ohio App.3d 310, 311; State v.Gumm (1995), 73 Ohio St.3d 413, 428. *Page 46 
 {¶ 192} First, appellant argues an objection should have been made to the comment of the prosecutor during his opening statement wherein he allegedly used the word "premeditated." Appellant does not reference where in the record this comment was made, how it was used, or how he was thereby prejudiced, as required by App. R. 16. The argument is therefore not well taken.
 {¶ 193} In any event, immediately before the prosecutor made his opening statement, the court instructed the jury that "the attorneys for the parties will * * * have active roles throughout the trial. They will make opening statements to you * * * and will argue the case as the last step before you hear my final instructions and commence your deliberations. Remember the attorneys are not witnesses, and since it is your duty to decide the case solely on the evidence which you see or hear in the case, you must not consider as evidence any statement of any attorney made during the trial." The trial court repeated this instruction during the jury charge. Further, appellant does not dispute that the trial court gave a full, complete and accurate jury instruction with respect to the required elements of aggravated murder with prior calculation and design.
 {¶ 194} As noted supra, the jury is presumed to follow the trial court's instructions. Loza, supra, at 75. As a result, any error in this regard could not have resulted in prejudice.
 {¶ 195} Next, appellant argues that during the jury voir dire, "the prosecutor talked about the appellant calmly smoking a cigarette after the first murder." He argues this comment alluded to the prosecutor's use of the word "premeditated," and that because trial counsel failed to object, counsel was ineffective. *Page 47 
 {¶ 196} Again, appellant does not cite where in the 2000 pages of jury voir dire this comment allegedly occurred, the context in which it was made or how he was prejudiced as a result, as required by App. R. 16. The argument is therefore not well taken. In any event, for all the reasons discussed supra, we fail to see how appellant could have been prejudiced by trial counsel's failure to object. We do note that police found a cigarette butt near the furnace room that revealed appellant's DNA. In light of the fact that appellant waited for Wanda to come home from church after he murdered Rebecca, it appears the prosecutor's comment was supported by upcoming evidence.
 {¶ 197} Next, appellant argues the state referred to him as a "maniac" during the trial, which, he argues, improperly alluded to his character and required an objection. Again, appellant does not give one reference in the entire 3500-page trial transcript to any such comment being made. As a result, pursuant to App. R. 16, the argument is not properly before us and is not well taken.
 {¶ 198} In any event, based upon our review of the record, we do not find one instance where the prosecutor referred to appellant as a "maniac." Amy testified that when she first met appellant, he introduced himself to her as "Maniac," and she did not know his true name for a whole year after she met him. Also, she had his nickname "Maniac" tattooed on her arm to show her commitment to him. Jazz testified that when she met appellant in 2002, she was introduced to him as "Maniac." Finally, when BK called Jazz using appellant's cell phone from inside Wanda's home, the caller ID on BK's phone left behind in Jazz's car indicated the call was from "Maniac."
 {¶ 199} During the trial neither the prosecutor nor any of the witnesses referred to appellant as a maniac. This is simply how appellant identified himself and how he *Page 48 
introduced himself to each of his accomplices. He can therefore hardly complain that these witnesses knew him as "Maniac."
 {¶ 200} Next, appellant argues the state questioned witnesses as to whether appellant watched CSI. Again, appellant does not cite in the record where this testimony occurred, and, pursuant to App. R. 16, the argument is not well taken. Further, appellant concedes trial counsel objected to this testimony, but argues that counsel should have specifically argued the testimony was improper character evidence. Since trial counsel objected to the testimony and the trial court is presumed to know the law, counsel's conduct was not deficient.
 {¶ 201} Moreover, we note from the record that appellant told his accomplices he wanted to destroy any trace of his DNA on the victims and crime scene evidence. Amy testified that appellant watched CSI and that each episode deals with DNA and blood. The court did not err in overruling the objection since the source of appellant's knowledge of DNA was relevant. Despite appellant's invitation, we are not willing to hold that watching network crime series such as CSI or in previous decades Perry Mason, Dragnet, and others constitutes evidence of bad character.
 {¶ 202} Appellant next argues that in final argument, defense counsel talked about appellant dragging the bodies of his victims, thus implying appellant was guilty.
 {¶ 203} Appellant does not refer to the trial transcript to show where such comment was made and the argument is therefore not well taken. However, from our review of the record, in making this argument, counsel was conceding that appellant was present while attempting to blame BK for his crimes. It is not uncommon for defense counsel to pursue the strategy of conceding that his client was present at the *Page 49 
crime scene yet innocent of all crimes, particularly where the evidence is as overwhelming as it was here that the defendant was present. Our review of the record reveals that trial counsel never conceded or even suggested that appellant was guilty of any of the offenses charged.
 {¶ 204} Finally, appellant argues that trial counsel neglected to object to juror number 10 when, during the trial, she informed the trial judge that she had learned that she knew one of the state's witnesses. The record reveals that during a break from the trial, a person approached the juror and said hello. She recognized him as a former classmate of her sister and said hello. She asked what he was doing there, and when he said he was going to be a witness in this case, she said, "stop" and told the court. She told the judge that her sister had gone to school with the witness in the past, and the juror only knew him by name because the school in their town was so small. She said neither she nor her sister ever dated the witness or socialized with him. She said her acquaintance with him would not affect her ability to judge his testimony as she would any other witness. Thus, there would have been no basis to object to the juror continuing to serve and trial counsel was not deficient for not doing so.
 {¶ 205} We hold that appellant's trial counsel was not deficient, and their representation did not result in prejudice to appellant.
 {¶ 206} Appellant's twelfth assignment of error is not well taken.
 {¶ 207} For his thirteenth assignment of error, appellant asserts:
 {¶ 208} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR, TO THE PREJUDICE OF APPELLANT, BY DENYING THE APPELLANT THE RIGHT TO REPRESENT HIMSELF, PRO SE." *Page 50 
 {¶ 209} Appellant argues he was deprived of the constitutional right to defend himself when the trial court denied his motion to dismiss his defense attorneys and represent himself. The record reveals that on October 26, 2006, 15 days after the trial had begun, appellant orally advised the court that he wanted to fire his attorneys and to represent himself. The court conducted a hearing at which appellant argued that he was more prepared than his counsel and could represent himself better than they could. Appellant's counsel both told the court that they had done the work necessary to prepare the case for trial and had investigated the case and all available defenses. They advised that they were in a position to properly defend appellant.
 {¶ 210} On October 27, 2006, the court noted that all discovery had taken place; the trial had started on October 11, 2006; and that appellant made his motion to represent himself for the first time on October 26, 2006, after the court had been in session on this case for 11 days. The jury had been empanelled, opening statements had been made by counsel, and six witnesses had been presented. The court denied the motion because: (1) it was untimely; (2) counsel's withdrawal would have prejudiced appellant in front of the jury, and (3) if the motion was granted, it would cause unjust delay and frustrate the administration of justice. The court found appellant's argument that he was not being adequately represented by counsel was not warranted and found his counsel's representation to be effective.
 {¶ 211} It is well settled that a defendant in a state criminal trial has a constitutional right of self representation, and may proceed to defend himself without counsel when he voluntarily and intelligently elects to do so. Faretta v. California (1975), 422 U.S. 806. However, the right of self representation is not absolute. The *Page 51 
defendant must voluntarily and intelligently elect to conduct his own defense. Id. at 835. Further, most courts require the defendant to make the motion in a timely manner. Martinez v. Court of Appeals (2000),528 U.S. 152, 162.
 {¶ 212} The Supreme Court of Ohio addressed this issue in State v.Cassano, 96 Ohio St.3d 94, 2002-Ohio-3751. In that case the Court upheld the trial court's denial of a capital defendant's motion to represent himself as untimely because it was filed three days before trial. The Court cited United States v. Mackovich (C.A. 10, 2000), 209 F.3d 1227 in support. In that case the court held that a request for self representation made six to ten days before trial was merely a tactic for delay.
 {¶ 213} Further, in State v. Vrabel, 99 Ohio St.3d 184,2003-Ohio-3193, the Ohio Supreme Court found a motion for self representation was properly denied as untimely where the defendant made the request after jury selection.
 {¶ 214} We reject appellant's argument that his right to represent himself was violated. His defense team had represented him since January, 2006, and appellant never expressed any desire to represent himself until 15 days after his jury trial had begun. If his motion had been granted, it would necessarily have resulted in the delay of his trial. We hold the trial court did not err in denying appellant's motion.
 {¶ 215} Appellant's thirteenth assignment of error is not well taken.
 {¶ 216} For his fourteenth assignment of error, appellant asserts:
 {¶ 217} "THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 218} Appellant challenges the jury's verdict as against the manifest weight of the evidence. Although a conviction may be sustained as having been based on *Page 52 
sufficient evidence, "a court of appeals may * * * nevertheless conclude that [the] judgment is against the weight of the evidence." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52.
 {¶ 219} There is a fundamental distinction between a challenge to the sufficiency of the evidence and a challenge to the weight of the evidence. The legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different from each other. Id. at 386. An appellate court reviewing the sufficiency of the evidence examines the evidence admitted at trial and determines whether, after viewing the evidence most favorably to the state, the jury could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, 273.
 {¶ 220} In contrast, the weight of the evidence concerns the inclination of the greater amount of credible evidence offered at trial to support one side of the issue rather than the other.Thompkins, supra, at 387. If, on weighing the evidence, the jury finds the greater amount of credible evidence sustains the issue that a party seeks to establish, that party will be entitled to its verdict. Id. "Weight is not a question of mathematics, but depends on its effect ininducing belief." (Emphasis sic.) Id., citing Black's Law Dictionary (6th ed. 1990), 1594. Thus, a court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v.Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14-*15. *Page 53 
 {¶ 221} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175. Hence, the role of a reviewing court is to engage in alimited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. State v. Brown, 11th Dist. No. 2002-T-0077, 2003-Ohio-7183, at ¶ 52, citing Thompkins, supra, at 390. However, an appellate court must defer to the factual findings of the jury regarding the weight to be given the evidence and credibility of the witnesses. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 222} When examining witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan (1986),22 Ohio St.3d 120, 123. The factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. Brown, supra, at ¶ 53. Moreover, if the evidence admits to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. Id. "As trial courts often note, proof beyond a reasonable doubt does not mean proof beyond any doubt." State v. Burgess, 11th Dist. No. 2002-L-019, 2004-Ohio-3338, at ¶ 37.
 {¶ 223} Appellant challenges the verdict by arguing the police did not adequately investigate the murders. He argues the state did not sufficiently investigate a threat that had been left on Rebecca's answering machine one month prior to the crimes and retrieved by Melissa. The caller stated he had recently been shot and he intended to shoot Rebecca, her mother and her son. First, Detective Pizzulo investigated to *Page 54 
determine the identity of the caller. Melissa told him she had asked Rebecca the name of the caller and she said his name was "Darius." The detective interviewed Rebecca's adult son Nathan, who advised the caller's full name was Darius Simmons. After the detective learned the caller's identity, he learned Simmons had been arrested on December 16, 2006; that when he came to the jail, he had been shot; and that he was still in jail. Detective Pizzulo testified that because Keyatta and Jazz independently corroborated each other's statements and both identified appellant as the killer, he said he stopped going in a direction that would have been futile. His decision was reasonable and appropriate under the circumstances. All the evidence pointed to appellant and since Simmons had an alibi, the detective would have been derelict in his duty if he had pursued this dead end rather than appellant.
 {¶ 224} Next, appellant argues the state should have more fully investigated Nathan's possible involvement in these crimes because Melissa suspected that some weeks earlier, he had broken into Wanda's house to steal some insulin needles. Melissa had no information linking him to the murders. In any event, Detective Pizzulo interviewed Nathan for several hours and determined Nathan had no involvement in these crimes. There is no evidence in the record to suggest Nathan had any involvement in these murders.
 {¶ 225} Appellant next lists various perceived deficiencies in the testimony of appellant's accomplices and suggests that in relying on these witnesses, the jury's verdict was against the manifest weight of the evidence. First, appellant argues Jazz did not mention appellant's gun in her statement until the police directly asked her about it. This is neither an omission nor an inconsistency. Appellant does not argue that this *Page 55 
witness ever denied appellant had a gun and then later changed her story. In explaining her failure to mention the gun earlier in her statement, she testified she did not remember. In light of the all the shocking events that happened that night, we do not find it unreasonable that Ms. McIver initially forgot to mention the gun. What is important is that she included this fact in her statement.
 {¶ 226} Appellant next argues that Jazz admitted she lied to the police when she told them she went in Amy's house to warn her. Jazz testified at trial she warned Amy about appellant's plan to kill her when they were at appellant's father's house. She testified the reason for her misstatement was that she was afraid. Again, what is important here is that Ms. McIver did warn Amy. The timing of this warning is not material and would not cause a reasonable jury to question her essential testimony.
 {¶ 227} Appellant argues BK's prior thefts from her grandmother should have cast doubt on her testimony. Of course, the jury was entitled to consider her prior thefts; however, it would have been reasonable for the jury to be more impressed by BK's candor in readily admitting her troubled past. In any event, her prior wrongs were not so serious as to allow us to second guess the jury's obvious decision to give weight to her testimony.
 {¶ 228} Appellant argues the inconsistency between BK and Jazz as to the amount of time Jazz waited for BK and appellant to return to the car after the murders should have weighed against giving credibility to their testimony. Jazz testified she was in the car waiting for them for almost an hour, while BK said she and appellant were in the house for about 20 minutes. This was the best estimate of both witnesses, and, given the circumstances, it would have been reasonable for the jury to conclude the *Page 56 
difference in testimony was not material. Jazz testified she was terrified waiting in the car alone in the dark and also was in a hurry to return home. On the other hand, during the entire time that BK was in the house with appellant, he was constantly giving her instructions on what to do. The jury could have reasonably found that what seemed like 20 minutes to BK seemed more like an hour to Jazz. It was not unreasonable for the jury to determine, as they obviously did, that the difference in testimony as to the length of time was not so significant that they should discredit these witnesses.
 {¶ 229} We observe that the testimony of each of these three witnesses was consistent and corroborated by the testimony of each other. The few instances of inconsistencies and contradictions involved minor details and would not have come close to causing a reasonable jury to question the thrust of their testimony. Further, it was most likely important to the jury that their testimony was corroborated by other indisputable evidence, including Detective Pizzulo's testimony concerning his investigation of the crime scene, the DNA evidence, and the cell phone records.
 {¶ 230} Finally, appellant argues it was "suspect" that Dr. Germaniuk's autopsy report was revised after Wanda was cremated. However, Dr. Germaniuk testified that Wanda's death certificate indicated the cause of death was "pending" because he was waiting for the results of the fire investigation and the toxicology tests. He explained that once those results were in, he prepared a "case reclassification sheet" as is usual when the cause of death is pending. In the autopsy report, he indicated there was no obvious trauma. This was consistent with his testimony that 80 per cent of Wanda's body was destroyed by fire. In his reclassification sheet, Dr. Germaniuk stated the extensive thermal injury with marked destruction of Wanda's remains precluded a *Page 57 
specific determination of the actual cause of death so that blunt force trauma and gunshot wounds could not be excluded as the cause of death. The jury could have reasonably concluded there was no material difference between Dr. Germaniuk's autopsy report and his reclassification sheet.
 {¶ 231} After our thorough and complete review of the record, we cannot say the jury clearly lost its way and created a manifest miscarriage of justice in returning its guilty verdict. We further hold the jury did not act contrary to the manifest weight of the evidence.
 {¶ 232} Appellant's fourteenth assignment of error is not well taken.
 {¶ 233} Appellant contends for his fifteenth and sixteenth (supplemental) assignments of error:
 {¶ 234} "[15] THE STATE KNOWINGLY USED FALSE AND/OR PERJURED TESTIMONY TO OBTAIN APPELLANT'S CONVICTION IN VIOLATION OF HIS RIGHTS PURSUANT TO THE FOURTEENTH AMENDMENT OF THE UNTITED [SIC] STATES CONSTITUTION.
 {¶ 235} "[16] THE STATE KNOWINGLY USED FALSE EVIDENCE TO OBTAIN APPELLANTS [SIC] CONVICTION IN VIOLATION OF HIS RIGHTS PURSUANT TO THE FOURTEENTH AMDNEMTNE [SIC] TO THE UNITED STATES CONSTITUTION."
 {¶ 236} Because the issues raised in these assigned errors are interrelated, they will be considered together. Appellant argues that BK offered perjured testimony and that the state was aware her testimony was false. It is well settled that a "conviction obtained through use of false evidence, known to be such by representatives of the *Page 58 
State, must fall under the Fourteenth Amendment * * *." Napue v.Illinois (1959), 360 U.S. 264, 269.
 {¶ 237} Appellant argues that BK possibly lied about four details in her police statement, and, as a result, the state obtained appellant's conviction based on false testimony. Appellant provides no references in the record to support any of these alleged lies, and his argument is therefore not well taken. App. R. 16. Appellant concedes that BK might have been testifying truthfully about these facts, which would make his argument moot. We do note that the "lies" about which appellant complains involve immaterial details such as stating that Amy made one of the calls to Western Union. In any event, appellant does not even attempt to argue the state knew BK lied about these details, and we fail to see how this testimony would be evidence the state knowingly used false testimony to convict appellant.
 {¶ 238} Under his sixteenth assignment of error, appellant argues the lack of Rebecca's DNA on the crowbar proves it never came in contact with her, so that the state's argument that Rebecca was beaten to death with it was a fabrication. However, the lack of Rebecca's DNA on the crow bar merely proves that her DNA was not found on the weapon. Both Jazz and BK testified that appellant had told them he used a crow bar to beat Rebecca. They also testified that appellant removed a crow bar from Wanda's house and threw it over the bridge. Appellant's efforts to conceal the crow bar stained in blood corroborates the witness testimony that he used it in committing his crimes. Whether appellant covered the crowbar when he beat Rebecca, whether he used another similar weapon on her, and whether he cleaned it before he beat Wanda with it are issues known only to appellant. The evidence showed the extraordinary and *Page 59 
criminal means used by appellant to destroy and conceal evidence of his involvement in these crimes. In any event, the state was not required to provide these answers or to prove the particular means by which appellant murdered the victims. The state's obligation was fulfilled by its presentation of proof beyond a reasonable doubt of appellant's guilt of the crimes charged.
 {¶ 239} Next, appellant argues there was no evidence to support the state's theory that appellant shot Wanda in the head. However, as appellant concedes, BK testified appellant told her he had shot Wanda in the head twice.
 {¶ 240} Appellant argues BK's testimony was contradicted by Dr. Germaniuk's autopsy report wherein he stated there was no evidence of obvious trauma. This conclusion reflected his testimony that 80 percent of Wanda's body and one-half of her skull had been destroyed by fire.
 {¶ 241} Further, there is no evidence to support appellant's assertion that Dr. Germaniuk falsified his reclassification sheet. As explained under our analysis of appellant's fourteenth assignment of error, the reclassification sheet did not change the basic conclusion in the autopsy report, but merely provided further explanation of the non-specific cause of death as noted in the autopsy report.
 {¶ 242} Finally, contrary to appellant's argument, the prosecutor did not argue to the jury that "he was sure a gun was used [on Wanda], declaring that his witnesses would not have said it unless it was true." To the contrary, the prosecutor argued that whether or not the gun was used was not the controlling factor as long as the state had proven that appellant was guilty of aggravated murder beyond a reasonable doubt. He further argued that because Wanda was found in a pool of blood and that both BK and *Page 60 
Jazz said in their separate statements that they saw appellant with a gun in the car shortly after the murders, it made sense to conclude the gun was used. The prosecutor's argument was reasonable and proper because it was based on evidence in the record.
 {¶ 243} In sum, there is no evidence in this record that the state knowingly used false testimony or false evidence to obtain appellant's conviction.
 {¶ 244} Appellant's fifteenth and sixteenth assignments of error are not well taken.
 {¶ 245} For the reasons stated in the Opinion of this court, the assignments of error are without merit, and it is the judgment and order of this court that the judgment of the Trumbull County Court of Common Pleas is affirmed.
 MARY JANE TRAPP, J., TIMOTHY P. CANNON, J., concur. *Page 1