[Cite as *State v. Messenger*, 2012-Ohio-2692.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                   CASE NO. 9-11-40

    v.

CHAD A. MESSENGER,                     O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Marion County Common Pleas Court
Trial Court No. 10-CR-500

Judgment Affirmed

Date of Decision:   June 18, 2012


APPEARANCES:

    *Robert C. Nemo* for Appellant

    *Brent Yager* for Appellee

**SHAW, P.J.**

{¶1} Defendant-appellant Chad A. Messenger ("Messenger") appeals the August 30, 2011 judgment of the Marion County Court of Common Pleas sentencing him to eighteen years in prison after a jury convicted him of Kidnapping, in violation of R.C. 2905.01(A)(3), a felony of the first degree, two counts of Rape, in violation of R.C. 2907.02(A)(2), both felonies of the first degree, Felonious Assault, in violation of R.C. 2903.11(A)(1), a felony of the second degree, two counts of Domestic Violence, in violation of R.C. 2919.25(A), both felonies of the fourth degree, and two counts of Violating a Protection Order, in violation of R.C. 2919.27(A)(1), both misdemeanors of the first degree.

{¶2} On April 9, 2010, Messenger and Christi Messenger ("Christi"), the victim in this case, were married. According to Christi, several months into their marriage Messenger became abusive.

{¶3} On September 12, 2010 the first of three incidents related to this case occurred between Messenger and Christi. On that date Messenger came into the bedroom he shared with Christi and a fight ensued wherein Messenger pulled Christi's hair and she pulled his. Messenger then pushed Christi off the bed causing her to hit her head on either a nearby table or a bed rail. As Christi attempted to crawl away from Messenger, Messenger took her into the living room, placed her into a chair and told her not to move. When Messenger left the

living room Christi ran out of the house and went to seek help from a neighbor. As a result of this incident, Christi was awarded a Temporary Protection Order ("TPO") against Messenger that required Messenger to have no contact with Christi even if she gave him consent.

{¶4} On September 16, 2010 the second incident related to this case occurred. On that date, Christi called the police due to Messenger repeatedly calling her in violation of the terms of the TPO. Officer David Clemons of the Marion Police was taking Christi's statement when Messenger called Christi again. Officer Clemons got on the phone and was cussed at severely by Messenger who was angry because another man was in the house with Christi. Officer Clemons informed Messenger that he was a police officer and that Messenger was in violation of the TPO. Messenger agreed to meet Officer Clemons at the police station fifteen minutes later but never showed up.

{¶5} On October 5-6, 2010 the third incident related to this case occurred. On the night of October 5, Christi and Messenger, having apparently reconciled despite the TPO still being in effect, went together to a bar called Wild Bill's in Marion at approximately 8 p.m. An argument ensued as they left Wild Bill's after Messenger accused Christi of flirting with the bartender. When they returned to their residence on Plymouth Street, the argument escalated to the point that Messenger smashed Christi's face into the floor of their home with enough force

that she thought her jaw was broken.  Afterward, Messenger forced Christi out of the house and into the Jeep that Christi owned.  As Christi fought against him, Messenger slammed Christi's right foot in the door of the Jeep several times.

{¶6} Next, Messenger got into the Jeep and drove Christi out to some property his parents owned in LaRue, Ohio.  At the property in LaRue Messenger digitally penetrated both Christi's vaginal and anal cavities against her will.  Messenger then drove Christi to a house he and Christi had been renovating where his Ford Explorer was parked and switched vehicles from Christi's Jeep to his Explorer, taking Christi with him.  Throughout the night and into the early morning hours of October 6 Messenger drove to various places until he had to go to work transporting mail in Delaware, Ohio.

{¶7} When Messenger exited the Explorer at work, Christi got out and sought assistance from one of Messenger's coworkers, Brian Criswell.  Though Criswell offered to let Christi use his phone, he was unwilling to dial 9-1-1 for Christi.  Christi was asked to leave the area by Criswell's supervisor so she went to a United Dairy Farmers nearby and called 9-1-1.  She was then taken to Grady Memorial Hospital.

{¶8} On October 14, 2010, as a result of the October 5-6, 2010 incidents, Messenger was indicted for Kidnapping in violation of R.C. 2905.01(A)(3), a felony of the first degree, two counts of Rape, in violation of R.C. 2907.02(A)(2),

both felonies of the first degree, Felonious Assault, in violation of R.C. 2903.11(A)(1), a felony of the second degree, Domestic Violence, in violation of R.C. 2919.25(A), a misdemeanor of the first degree, Violating a Protection Order in violation of R.C. 2919.27(A)(1), a misdemeanor of the first degree, and Disrupting Public Services in violation of R.C. 2909.04(A)(3), a felony of the fourth degree.

{¶9} On November 10, 2010, the State filed a supplemental indictment related to the events of October 6, adding a charge of Domestic Violence, in violation of R.C. 2919.25(A), a felony of the fourth degree, based on Messenger's prior conviction of Assault, in violation of R.C. 2903.13, a misdemeanor of the first degree.[1]

{¶10} On April 14, 2011, the State filed another supplemental indictment charging Messenger with Domestic Violence in violation of R.C. 2919.25(A), a felony of the fourth degree, for the September 12, 2010 incident, and another count of Violating a Protection Order, in violation of R.C. 2919.27(A)(1), a misdemeanor of the first degree, for the September 16, 2010 incident.

{¶11} On August 15, 2011 the State filed a *Nolle Prosequi* as to the misdemeanor Domestic Violence charge from the original indictment and as to the Disrupting Public Services charge from the original indictment.

---

[1] This July 29, 2010 conviction for Assault was amended from a charge of Domestic Violence. Christi was the victim in that case. (State's Ex. 2).

{¶12} Messenger pled not guilty to all of the charges and the case proceeded to a jury trial which was held August 15-17, 2011. The jury found Messenger guilty on all counts, namely: Kidnapping in violation of R.C. 2905.01(A)(3), a felony of the first degree; two counts of Rape, in violation of R.C. 2907.02(A)(2), both felonies of the first degree; Felonious Assault, in violation of R.C. 2903.11(A)(1), a felony of the second degree; two counts of Domestic Violence, in violation of R.C. 2919.25(A), both felonies of the fourth degree; and two counts of violating a Protection Order in violation of R.C. 2919.27(A)(1), both misdemeanors of the first degree.

{¶13} On August 24, 2011 the court held a sentencing hearing. On August 26, 2011, the court held a second sentencing hearing to notify Messenger of his duties under the Adam Walsh Act. On August 30, 2011, the court filed its Judgment Entry sentencing Messenger to 18 years in prison.[2]

{¶14} It is from this judgment that Messenger appeals, asserting the following assignments of error for our review.

---

[2] Messenger was sentenced to nine years in prison on the Kidnapping charge and seven years in prison on the Felonious Assault charge with those sentences to be served concurrently. Messenger was sentenced to eight years in prison on each Rape charge, with those sentences to be served concurrent to each other, but consecutive to the Kidnapping/Felonious Assault sentence. The Domestic Violence charge arising out of the October 6, 2010 incident merged with the felonious assault charge. On the Domestic Violence charge arising out of the September 12, 2010 incident, Messenger was sentenced to one year in prison to be served consecutive to all other charges. Messenger was sentenced to 180 days in jail on both Protection Order Violations to be served concurrent with all of the other prison terms, creating an aggregate sentence of 18 years in prison. Messenger received credit for time served.

**ASSIGNMENT OF ERROR I**

**THE TRIAL COURT ERRED IN ALLOWING A POLICE OFFICER TO GIVE OPINION EVIDENCE ON BATTERED WOMAN SYNDROME, NOT ONLY GENERALLY, BUT BY ALLOWING OPINION EVIDENCE AS IT RELATED TO THE ALLEGED VICTIM.**

**ASSIGNMENT OF ERROR II**

**APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT OF HIS COUNSEL'S FAILURE TO OBJECT TO NUMEROUS EVIDENTIARY MATTERS.**

**ASSIGNMENT OF ERROR III**

**THE JURY'S GUILTY VERDICTS OF RAPE, KIDNAPPING, FELONIOUS ASSAULT AND DOMESTIC VIOLENCE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶15} In the interests of clarity, we elect to address the assignments of error out of order.

*Third Assignment of Error*

{¶16} In his third assignment of error, Messenger argues that his convictions for Rape, Kidnapping, Felonious Assault and Domestic Violence were against the manifest weight of the evidence. Specifically, Messenger argues that testimony presented in the State's case was not credible and that the jury clearly lost its way in reaching its verdict.

{¶17} When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3d Dist. No. 1-05-70, 2006-Ohio-3764, ¶ 30, citing *State v. Martin*, 20 Ohio App.3d 172 (1983); *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. *Id*.

{¶18} Although the appellate court acts as a "thirteenth juror," it still must give due deference to the findings made by the fact-finder. *State v. Thompson*, 127 Ohio App.3d 511, 529 (1998). The fact-finder, being the jury, occupies a superior position in determining credibility. *Id*. When examining witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). To reverse the judgment of a trial court on the weight of the evidence based upon a jury's verdict, a unanimous concurrence of all three

judges on the reviewing panel is required. *Thompkins*, at paragraph four of the syllabus.

{¶19} On appeal, Messenger contends his convictions for Kidnapping, two counts of Rape, Felonious Assault, and two counts of Domestic Violence were against the Manifest Weight of the Evidence. The statutes related to those charges as indicted read:

**KIDNAPPING**

**(A)  No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:**

**\* \* \***

**(3)  To terrorize, or to inflict serious physical harm on the victim or another;**

R.C. 2905.01(A)(3).

**RAPE**

**No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.**

R.C. 2907.02(A)(2).

**FELONIOUS ASSAULT**

**(A)  No person shall knowingly do either of the following:**

**(1)  Cause serious physical harm to another or to another's unborn;**

R.C. 2903.11(A)(1).

**DOMESTIC VIOLENCE**

**(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.**

R.C. 2919.25(A).

{¶20} As the charges arose out of incidents that occurred on different dates, we have separated the testimony and evidence presented at trial below according to the date in which the incident took place.

*September 12, 2010*

{¶21} Christi testified that on September 12, 2010 she was sitting in the living room of the residence she shared with Messenger on Plymouth Street in Marion playing a game on her phone while Messenger kept cussing at her so she went into the bedroom and locked the door. (Tr. at 140). According to Christi, Messenger then "busted" open the door and got on top of her and tried to make her smoke a joint. (Tr. at 140). They ended up pulling each other's hair and he shoved her off the bed causing her to crack her head on the bed rail or on the table beside the bed. (Tr. at 142).

{¶22} Christi testified that she tried to crawl away but Messenger shoved her into a chair in the living room and said "bitch, you just fucking set (sic) there

in that chair you stupid bitch, you ain't going nowhere." (Tr. at 142). Christi testified that when Messenger turned away to go into the bathroom, she took off running toward the neighbors' house down the street to call the cops. (Tr. at 142).

{¶23} Christi ran to a house nearby, knocked on the door and asked to use the phone. Kayla Lucas corroborated this in her testimony, affirming that Christi came to her door crying and asked to use her phone. (Tr. at 361-62). Lucas testified that she turned Christi away saying she did not have a phone. (Tr. at 361-62). Lucas testified that though she could hear Christi crying, Lucas did not know Christi and could not see her well so she turned her away. (Tr. at 361-62).

{¶24} Christi testified that after being turned away by Lucas she saw Messenger and his son Brandon leaving the house so Christi went back into her house, retrieved her cellular phone and called the police. (Tr. at 143). Sam Rietschlin of the Marion City Police Department responded. (Tr. at 352). Rietschlin testified that Christi was crying and that he took pictures of her injuries. (Tr. at 354-55). Christi indicated to Rietschlin that some of her bruises were from previous encounters with Messenger. (Tr. at 355). On cross examination Rietschlin testified that he did not find any blood at the scene of the incident. (Tr. at 358).

{¶25} Messenger testified that he and Christi did get into an argument on September 12 that resulted in them pulling each other's hair. (Tr. at 447). He

further testified that they got into a physical altercation "every other day or two or three days." (Tr. at 447). According to Messenger, after the hair pulling, he left the premises with his son and did not return that night. (Tr. at 448). Further, Messenger testified that during the next couple of weeks he stayed with a friend of his until he and Christi reconciled later that month. (Tr. at 449).

{¶26} As a result of the September 12 incident, Christi was awarded a TPO against Messenger. Messenger testified that he was aware of the TPO. (Tr. at 449).

*September 16, 2010 Incident*

{¶27} Christi testified that on September 16, 2010, Messenger repeatedly called her in violation of the terms of the TPO using a restricted phone number. (Tr. at 144). Christi notified the police and Officer Clemons was dispatched to take a statement. Clemons and Christi both testified that while Clemons was present, Messenger called again. (Tr. at 144, 365). Clemons testified that he took the phone and a man identifying himself as Messenger was "yelling, screaming, ranting, making accusations about there being another man in the house." (Tr. at 365). After Clemons identified himself as an officer, Messenger agreed to meet Clemons at the police station for violating the TPO but Messenger never showed up. (Tr. at 367).

*October 5-6, 2010*

{¶28} Christi testified that on the night of October 5, 2010 she went to a bar with Messenger called Wild Bill's in Marion. (Tr. at 146). She testified that the two got into an argument that continued when they returned home. (Tr. at 148). Christi testified that after they returned home Messenger grabbed her and slammed her on the floor causing her to hit the back of her head. (Tr. at 149). She testified that Messenger then picked her up by her hair and slammed her down on her face and jaw causing her to believe she broke her jaw. (Tr. at 149). Christi testified that Messenger then carried her out to her Jeep against her will without any shoes on and that Christi kicked at Messenger to try to prevent being put into the Jeep. (Tr. at 150-51). According to Christi, Messenger repeatedly slammed the driver-side door of the Jeep on Christi's right foot. (Tr. at 151). Afterward Christi testified that Messenger got into the Jeep and they traveled toward LaRue where Messenger's parents owned some property. (Tr. at 151).

{¶29} Christi testified the following occurred when they arrived at the property in LaRue.

> **[Messenger] starts * * * running ruts and stuff in the cornfield and everything. Running around in a circle, then he slams on the brakes, * * * and he opens the door and he's cussing at me again and he grabs a hold of me and throws me out onto the ground. And somehow, I don't know how, I don't know if my pants were loose or what, but my pants are like down halfway almost to my knees, so I'm laying there feeling butt naked and it's cold and it's dark and I'm scared to death. * * * I thought he was gonna like get back in the Jeep and run me over. That's why I thought he threw me out. I didn't know why. And then**

**he's telling me 'shut the fuck up you stupid bitch".  (sic)  I told him no, I told him he can go burn in hell and just leave me alone.  He's wanting me to get back in the Jeep after that.  I'm like "no, go away and leave me alone and I'm crying.  He gets out and he picks me back up and I thought he was gonna just throw me back in the Jeep.  That's not what he done.  He bent me over and he started jamming his fingers and his thumb and kind of – I think that's all it was, I'm not sure cause I couldn't see.  He starts jamming them in my vagina and mainly in my anal area.  He did it probably eight to 10 or 15 times.  And it hurt bad.**

**Q:  Did you tell him?**

**A:  It hurt bad.  I was trying to get him to stop and I couldn't, I couldn't, it hurt – I have never had anything like that done to me in my life.**

**Q:  Did you – I think did you ask him to stop?**

**A:  Yeah, I was screaming at him to stop.  He wouldn't.  I was trying to push him off of me and I couldn't.**

(Tr. at 152-53).

{¶30} According to Christi, Messenger then shoved her back into the Jeep against her will, she "balled back up" and he took off again.  (Tr. at 154).  From there Messenger took her to a house they had on Marsh Street in LaRue.  (Tr. at 155-56).  At the house on Marsh Street, Messenger told Christi that he ran the Jeep out of gas and they had to get in his Ford Explorer.  (Tr at 156).  Messenger then offered to get Christi gas, she declined saying she would not go anywhere with him.  (Tr. at 156).  Christi testified that they remained at the Marsh Street residence for maybe "an hour to two hours."  (Tr. at 156).  Christi testified that at

one point she tried to escape out of the window (the passenger side door was not functional) but Messenger stopped her. (Tr. at 156). Christi testified that Messenger eventually gave her the Jeep keys and said "okay bitch, here's your keys, fuck it, take it and go." (Tr. at 156). From there Messenger exited the vehicle and got into the Explorer. (Tr. at 156).

{¶31} Christi testified that Messenger then bumped her Jeep with the Explorer, got out of the Explorer, pulled her out of the Jeep, dragged her into the Explorer and drove off again down a country road. (Tr. at 159). According to Christi, while driving down the country road, Messenger called her a "whore" and a "bitch" and Christi was "begging" him to leave her alone and to quit. (Tr. at 159). Christi testified that on one country road Messenger stopped and told her to get out of the Explorer, which she did. (Tr. at 160). Messenger then drove off up the road but turned back and put her back into the Explorer. (Tr. at 160).

{¶32} Christi testified that next they drove to a Speedway to get gas and she tried to get out but Messenger drove right through the Speedway without getting out. (Tr at 161). From there, Christi testified that Messenger drove her around to various locations until they ended up back in Delaware where Messenger had to work on the morning of October 6. (Tr. at 162). Once Messenger exited the vehicle at work, Christi testified that she got out and looked for help, running into one of Messenger's coworkers, Brian Criswell. (Tr. at 163).

{¶33} Criswell testified that when he saw Christi she had no shoes on, there was a tear in her jeans and she had swelling on her face. (Tr. at 215). Criswell testified that Christi tried to dial a number on his cell phone but there was a problem and she asked him to call 9-1-1 for her. (Tr at 223). On cross-examination Criswell testified that Christi only tried to dial two numbers then asked him to dial 9-1-1. (Tr. at 223). Christi and Criswell both testified that Criswell's supervisor told Christi she could not be in the area and made her leave. (Tr. at 163). Christi testified that she made her way to a nearby United Dairy Farmers and called 9-1-1. (Tr. at 164).

{¶34} Messenger was taken to Grady Memorial Hospital where she was examined by Debra Virden, a Sexual Assault Nurse Examiner ("SANE"). Virden testified that in her 25 years as a nurse, 15 as a SANE nurse, having handled roughly 150-200 SANE examinations she had only seen perhaps four people with injuries as extensive as Christi's. (Tr. at 236, 274). Virden documented a contusion on Christi's face and various other red, blue, yellow and purple bruises and abrasions on her body. (Tr. at 247). Virden observed a three centimeter red-purplish bruise around Christi's anal cavity and a red tear in Christi's vaginal cavity that was about "an eighth of an inch." (Tr. at 247, 251). The State entered pictures of the bruising into evidence along with the documents from Grady

Memorial Hospital. (State's Ex's 15a-15n, 1). Virden testified that the injuries she found were consistent with the story Christi told her. (Tr. at 298).

{¶35} On cross-examination of Virden, Virden testified that she was unable to date the vaginal tear and that the injuries could also have resulted from consensual sex. (Tr. at 289-294). Virden further testified that the bruises were different colors and some indicated they were several days old while others indicated they were fresh. (Tr. at 284-286).

{¶36} Andrew Isom of the Marion City Police Department was dispatched to Grady Hospital to speak with Christi. (Tr. at 304). Isom observed her injuries and took her statement. (Tr. at 308-310). Isom also took pictures which he identified and were entered into evidence at trial. (Tr. at 311).

{¶37} Natalie Saracco of the Bureau of Criminal Identification and Investigation tested samples collected by Nurse Virden and testified as to the results of samples taken. (Tr. at 327). Saracco testified that the results from the vaginal swab identified semen and showed a presumptive positive for the presence of blood. (Tr. at 331). The results from the underwear sample showed a presumptive positive for blood, semen, and amylase.[3] (Tr. at 331). The results from the anal samples did not test presumptive positive for semen. (Tr. at 331).

---

[3] According to testimony at trial, amylase is a component of saliva, urine, and sweat. (Tr. at 332).

The results from the pubic/anal area tested presumptive positive for blood and semen. (Tr. at 332).

{¶38} Tim Rowe, a Police Officer for the City of Marion visited the house in Marion and testified that he found a trash can was knocked over, there were tire tracks, and it looked as if someone left in a hurry. (Tr. at 343). Rowe did admit on cross-examination that there were no blood stains or hair that he noticed in the home and that he did not know how anything was knocked over. (Tr. at 345-46).

{¶39} Bob Peterson, an investigator with the County Prosecutor's Office, photographed the bruising on Christi's foot on October 13, 2010, a week after the incident. (Tr. at 347). He testified to taking the photographs and those photographs were introduced into evidence.

{¶40} Patrolman Electa Foster went to the home of Christi and Messenger and testified that she found the back door wide open and that she observed some cigarette butts on the floor of the living room. (Tr. at 380-82). On cross-examination Foster testified that she found no blood in any of the vehicles or at the home. (Tr. at 408). At trial Foster identified a surveillance video from Speedway depicting an Explorer pulling into the Speedway, pausing near the gas pumps, then driving off seconds later without anyone getting out. (Tr. at 376). Foster also testified at trial regarding the cycle of domestic violence. (Tr. at 371-75).

{¶41} After the State presented the foregoing testimony related to the October 5-6 incident, the State rested its case. Messenger then took the stand in his own defense, and testified that he and Christi did travel to the places as Christi said, but he testified that he did not slam her face in the ground, he did not slam her foot in the Jeep door, he did not digitally rape her, and he did not hold her against her will. Messenger testified that Christi came with him willingly and he did not hit her. Furthermore, Messenger testified to an alternative explanation as to how Christi received her injuries.

{¶42} According to Messenger, upon returning home from Wild Bill's Christi was very intoxicated and fell getting out of the Jeep hitting her jaw on the Jeep's tire. (Tr. at 463). Then, Messenger testified, shortly after they went inside, they got into an argument where Messenger informed Christi that he was filing for divorce and Christi smacked him. (Tr. at 466).

{¶43} Messenger testified that he grabbed some clothes to leave and started to take them out to the Jeep and while he was taking the clothes out, Christi was in his way and walking backwards. (Tr. at 466-67). Messenger testified that she fell backward into the recliner then into the cigarette rolling machine, landing on her back and buttocks likely causing the bruising she had. (Tr. at 467, 504-05). Messenger testified that during one of his trips out of the house with the clothes, he stepped on Christi's foot which would account for the bruising. (Tr. at 467).

{¶44} Messenger testified that Christi went willingly with him when he left, and that Christi's pants were down at the property in LaRue because she had to urinate. (Tr. at 467-69). Messenger denied raping her and testified that they had had consensual sex "everyday" between September 28, 2010 and October 5, 2010. (Tr. at 453). According to Messenger, he and Christi frequently had sex including anal sex. (Tr. at 451). Furthermore, Messenger testified that Christi wanted to engage in "weird" sexual activity that he had never done to any other woman. (Tr. at 452). This included suffocation with a pillow. (Tr. at 452).

{¶45} Messenger testified that after Christi urinated at the LaRue property the two smoked crack cocaine together and then eventually left the property. (Tr. at 470). Messenger testified that at no point was he holding Christi against her will and that Christi simply got out of the Explorer when he went to work the next morning. (Tr. at 480). Messenger also testified that he personally asked Criswell to take Christi home. (Tr. at 480). Criswell corroborated that such a conversation took place, but Criswell testified it was over the phone rather than in person. (Tr. at 224-25).

*Analysis*

{¶46} Rather than argue that there was insufficient evidence to support his convictions, Messenger contends that the greater amount of credible evidence weighed against his conviction. Although Messenger provides some alternate

explanations for the incidents and injuries of Christi, there still was a significant amount of testimony accompanied by a multitude of photographs entered into evidence which a jury could have properly weighed in favor of Christi and thus convicted Messenger of the charges against him beyond a reasonable doubt. Christi's testimony was largely corroborated by Nurse Virden or various police officers. Though the witnesses were unable to say definitively that the injuries and evidence occurred precisely the way Christi said they did, the witnesses did testify that the injuries and evidence were consistent with her story. Accordingly, we cannot find that the jury "clearly lost its way" or that Messenger's convictions for two counts of Rape, one count of Kidnapping, one count of Felonious Assault, and two counts of Domestic Violence were against the manifest weight of the evidence.

{¶47} Appellant's third assignment of error is overruled.

*First Assignment of Error*

{¶48} In Messenger's first assignment of error, he argues that the trial court erred in allowing a police officer to give opinion evidence on battered woman's syndrome. Specifically Messenger contends that under the Ohio Supreme Court's holding in *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, the testimony of Patrolman Electa Foster went beyond admissible testimony related to battered-

woman's syndrome and into the realm of impermissible opinion testimony as to Christi's credibility thereby warranting reversal.

{¶49} At the outset we note that Messenger did not object to the purportedly impermissible testimony of Foster at trial that he now argues is prejudicial, and thus the trial court did not have the opportunity to address this issue. Therefore, the matter will be addressed using a plain error standard. *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325. Plain error requires proving that, "*but for* the [trial court's] error, the outcome of the trial *clearly would have been otherwise*." (Emphasis in original.) *Id*. at ¶ 50 quoting *State v. Long*, 53 Ohio St.2d 91, paragraph two of the syllabus.

{¶50} At trial, after Christi had been cross-examined about getting back together with Messenger despite the previous incidents of violence and the TPO, the State called Patrolman Electa Foster of the Marion Police Department. Foster worked for the Marion police department for 20 years and she spent 12 of those years as the Violence Against Women Officer where she handled domestic violence and sex offense investigations. (Tr. at 370). Foster testified that during those 12 years she was involved with "thousands" of domestic violence cases and hundreds of sexual assault cases. (Tr. at 371). Foster also testified that she had attended 28 training sessions over those 12 years both in and out of state related to domestic violence and sexual assault. (Tr. at 371).

{¶51} After covering her background, Foster provided testimony regarding the cycle of domestic violence and testified that she heard Christi testify about reconciling with Messenger after the earlier assault incident. (Tr. at 373-75). The following exchange then took place between the State and Foster.

> **Q: [STATE] So for example, in this case we have the June assault, then a September 12th domestic violence incident that's before this jury that Officer Rietschlin investigated, the October (sic) 16th, 2010 TPO violation that's before this jury that Officer Clemons investigated, and then here we have apparently October 6th and she's willing to go to – apparently willing to go to Wild Bill's with this guy and shoot pool. Does that make any sense to you?**
>
> **A: [PATROLMAN ELECTA FOSTER] It doesn't make sense, but with my training that's what I see. It's very, very common in these relationships.**

(Tr. at 375).

{¶52} Messenger argues that during this exchange, Foster's reference to "these relationships" groups Messenger and Christi's relationship into one of a repeated cycle of domestic violence. Messenger contends that Foster's testimony goes beyond the bounds of what is permissible pursuant to *Haines* by stating that Messenger was a batterer.

{¶53} When taking the testimony of Foster in context, we find that Foster is merely testifying to her experience as a police officer, not that she personally believes the victim or that she is affirming that Messenger is an abuser. Foster is simply making a broad statement that based upon her training and experience, it is

not uncommon to see people reconcile in these situations. As such, Foster's testimony was properly admissible based solely on her experience as a police officer without reference to any expertise or opinion as to the "battered-woman syndrome." Therefore, we find that Messenger's argument is without merit.

{¶54} Accordingly, Messenger's first assignment of error is overruled.

*Second Assignment of Error*

{¶55} In Messenger's second assignment of error, he claims that he was denied his right to effective assistance of counsel. Specifically, Messenger claims that his trial counsel was ineffective for failing to object to several segments of evidence and testimony that cumulatively were prejudicial.

{¶56} "Reversal of convictions on ineffective assistance requires the defendant to show 'first that counsel's performance was deficient and, second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.'" *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751 at ¶105 quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052 (1984). When considering a claim of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

{¶57} A tactical decision by trial counsel, who as a licensed attorney is presumed to be competent, is not by itself enough to show ineffective assistance of

counsel simply because the strategy did not result in an acquittal. *State v. Clayton*, 62 Ohio St.2d 45, 48-49 (1980); *State v. Timm*, 3d Dist. No. 13-11-23, 2012-Ohio-410, ¶ 31. "Furthermore, trial counsel's failure to object is generally viewed as trial strategy and does not establish ineffective assistance." *State v. Turks*, 3d. Dist. No. 1-08-44, 2009-Ohio-1837, ¶ 43, citing *State v. McKinney*, 11th Dist. No. 2007-T-0004, 2008-Ohio-3256, ¶ 191; *State v. Gumm*, 73 Ohio St.3d 413, 428; *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 103.

{¶58} Among some thirty arguments that Messenger raises in an attempt to illustrate ineffective assistance of counsel the vast majority relate to decisions that fall under "trial strategy." As such we find that the decisions of trial counsel not to object to specific testimony fail to establish any deficiency.

{¶59} Examples of failure to object complained of by Messenger include: that trial counsel erred by not objecting to testimony by Christi of a domestic violence incident occurring June 29, 2010 not at issue in this case, that trial counsel erred by not objecting to testimony of Christi that abuse began three months into the marriage, that trial counsel erred by not objecting to testimony of Christi that she thought Messenger was trying to kill her, and that trial counsel erred by not objecting to testimony of Christi that Messenger abused her daily or every other day.

{¶60} Messenger also argues that trial counsel erred by not objecting to testimony of Christi on trial counsel's cross-examination when Christi was unresponsive to the questions and offered testimony such as Messenger having charges filed against him relating to his daughters, Messenger being sent to jail, Messenger purposely taking off the roof of the LaRue residence, Messenger grabbing Christi and slamming her to the floor, Christi saying she was in fear of Messenger, Christi saying Messenger would abuse her like he always did, and Christi screaming rather than blowing the horn.

{¶61} Messenger also complains of trial counsels' failure to object to Nurse Virden's medical testimony regarding blunt force trauma, Nurse Virden's testimony that Christi's bruises were consistent with Messenger holding her, Nurse Virden's testimony about whether the injuries could have caused serious harm or death, Nurse Virden's testimony of Christi's history, Nurse Virden's testimony that Christi informed her there were threats of homicide, and testimony by Nurse Virden as to the extent of the injuries relative to other cases.

{¶62} Additionally, Messenger complains of trial counsel not objecting to Officer Isom's testimony that Christi's foot injury was consistent with being slammed in a door and that her injury was consistent with her history; Officer Rowe's testimony regarding tire tracks and a trash can being knocked over in the

home, and Officer Rietschlin's testimony to injuries occurring before September 12.

{¶63} Messenger also complains that trial counsel elected not to request a *Daubert* hearing for Nurse Virden, Natalie Saracco, and Officer Foster. However, Nurse Virden provided medical testimony helpful to Messenger in that some of the bruises including one on the anus were older indicating potentially consensual sexual activity as Messenger argued. Furthermore Natalie Saracco's testimony could arguably have been beneficial to Messenger in that it reaffirmed that Messenger and Christi had had consensual sex so recently prior to this incident that semen was still present. And as discussed under the first assignment of error, Officer Foster's testimony did not rise to any level of scientific expertise beyond her experience as a police officer, thus providing no basis for a *Daubert* hearing.

{¶64} In sum, all of the foregoing testimony was successfully utilized by trial counsel as consistent with non-culpable explanations offered by Messenger or as indicative of vindictive motive on the part of Christi or otherwise impeaching of Christi's credibility, and thus are all consistent with effective trial strategy.

{¶65} Messenger next argues that trial counsel was ineffective for failing to object to the State's closing argument and the State's rebuttal closing argument on the basis of alleged improper references of the Prosecutor. The test regarding prosecutorial misconduct during closing arguments is whether the remarks were

improper and, if so, whether they prejudicially affected the substantial rights of the defendant. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 231. "In making this determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist. 1995). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Davis*, *supra*, at ¶ 231 quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982). Prosecutorial misconduct is generally not grounds for reversal unless it so taints the proceedings as to deprive the defendant of a fair trial. *State v. Johns*, 3d. Dist. No. 13-04-23, 13-04-24, 13-04-25, 2005-Ohio-1694, ¶ 25.

{¶66} Messenger first claims that trial counsel was ineffective for failing to object to a statement made by the State in closing argument regarding the events between Messenger and Christi at the Delaware post office. The statement at issue was made during the following section of the State's closing argument.

> **[Messenger]'s toying with her. He's terrorizing her. He's controlling her. That's what he wants to do. "I'm in charge. You'll get out when I tell you to get out. You'll get in when I tell you to get in".**
>
> ***Go to the post office, unfortunately they don't have any video, we checked. Officer Foster checked, but we didn't have it.*** **But then he leaves in the truck and they go to Speedway. And what did she tell them? What did she tell them the very next day within two hours from making the 9-1-1 call? "He went through Speedway and he was gonna stop and I saw him start to get out so I tried to get out, he saw it and grabbed me and we took off again."**
>
> **\* \***
>
> **The video, State's Exhibit 8, of Speedway further corroborates what she had to say. She told it right away and it corroborates it.**

(Emphasis Added.) (Tr. at 561-62).

{¶67} Messenger specifically objects to the italicized portion of the closing argument claiming, correctly, that Officer Foster never testified to checking for video of Christi and Messenger at the post office. The State's comment at issue came in the context of describing how various pieces of evidence were consistent with Christi's version of events. The State mentioned how it did not have video of the post office but stated that it did have video from Speedway that was consistent with Christi's story of what occurred at the Speedway. The Speedway video was identified by Officer Foster. No testimony was ever given that Officer Foster checked for video of anything that occurred at the post office.

**{¶68}** While we find that the specific comment in question was indeed improper as Officer Foster never testified that she checked for video at the post office, we do not find that this statement so "tainted" the trial as to merit reversal. A reference in passing to evidence that the State admits does not exist, without more, is insufficient to satisfy the standards above for prosecutorial misconduct. Furthermore, as the reference is insufficient to show prosecutorial misconduct, it is insufficient to establish ineffective assistance of counsel due to Messenger's inability to establish prejudice.

**{¶69}** Messenger next argues that his trial counsel was ineffective for failing to object to an inappropriate comment made by the State in the State's rebuttal closing argument. In Messenger's closing argument he raised the point that there was no blood located in either of the vehicles that Christi and Messenger were in on the night of October 5-6, 2010 and that there was no blood located in the home where the violence began. (Tr. at 582-83). Then, in the State's rebuttal closing argument, the State made the following statement.

> **Well, as you saw most of the injuries are blunt force from bruising and so forth. They're just not cuts. However, there was blood found on the underwear. There was blood found in the vagina. \* \* \* *And I would submit to you that abusers many times don't want to leave injuries readily seen or cuts like that*. Even though with her he's still again, look at the pictures, look at the different times of the pictures and look at all the bruising.**

(Emphasis added.) (Tr. at 592). Messenger specifically objects to the italicized comment, arguing that no such evidence was presented at trial as to the pattern of conduct of abusers and that any opinion by the prosecutor concerning such evidence was objectionable.

{¶70} Based upon the context of the italicized statement at issue and the evidence produced at trial discussed at length above, we find this statement of the Prosecutor during his rebuttal closing argument to be more in the nature of an argument made in response to an argument raised by defense counsel, rather than an improper assertion of fact not based upon evidence. Nevertheless, even assuming *arguendo* the comment was improper, we do not find that it so tainted the trial as to merit reversal or that failure of counsel to object prejudiced Messenger sufficiently to establish a valid claim of ineffective assistance of counsel.

{¶71} As a final aspect of Messenger's claim for ineffective assistance of counsel, he argues that all of the above matters constitute, in the aggregate, support for a cumulative finding of ineffective assistance of trial counsel. However, since we have found no prejudicial ineffective assistance of counsel on any of the instances, a cumulative argument is not supported. Accordingly Messenger's second assignment of error is overruled.

{¶72} For the foregoing reasons, Messenger's assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, J., concurs.**
**ROGERS, J., concurs in Judgment Only.**

**/jlr**